**Affirmed and Opinion filed August 3, 2017.**



In The

# Fourteenth Court of Appeals

### NO. 14-16-00681-CV

## UNIVERSITY OF TEXAS M.D. ANDERSON CANCER CENTER, Appellant

### V.

## LANCE MCKENZIE, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF COURTNEY MCKENZIE-THUE (DECEASED), DEBORAH DIVER, INDIVIDUALLY AND AS NEXT FRIEND OF J.O., A MINOR, Appellees

**On Appeal from the 165th District Court
Harris County, Texas
Trial Court Cause No. 2013-74868**

## O P I N I O N

In this medical malpractice case, the family of a patient who died after participating in a clinical trial at the University of Texas M.D. Anderson Cancer Center ("MDACC") alleges that the patient died because of MDACC's negligence. MDACC brings this interlocutory appeal challenging the trial court's denial of its

plea to the jurisdiction. MDACC contends that the family's allegations and jurisdictional evidence do not establish a negligent use of tangible personal property as required to waive its governmental immunity under section 101.021 of the Texas Tort Claims Act ("TTCA").[1] Concluding that the family's allegations, coupled with the evidence presented, are sufficient to support a waiver of immunity, we affirm.

## Background

Courtney McKenzie-Thue suffered from advanced stage IV cancer of the appendix and received treatment from MDACC in December 2011. The treatment involved a surgical/chemotherapeutic protocol originally developed by Wake Forest University School of Medicine and Wake Forest Baptist Medical Center (the "Wake Forest protocol"). At MDACC, McKenzie-Thue participated in phase two clinical trials of the Wake Forest protocol. The purpose of the Wake Forest protocol was to compare the efficacy of two chemotherapeutic agents: mitomycin C and oxaliplatin. McKenzie-Thue was randomized to the group receiving oxaliplatin in the study.

The Wake Forest protocol calls for a multi-part procedure. First, the surgical oncologist opens the peritoneal cavity[2] of the patient and resects all visible signs of cancer. Then, the patient's abdominal skin is sutured closed and the patient's peritoneal cavity is flushed—or "perfused"[3]—with a chemotherapeutic agent mixed with fluid, using a heart/lung bypass machine acting as a pump to heat the fluid and circulate it throughout the peritoneal cavity. This portion of the procedure is called

---

[1] Tex. Civ. Prac. & Rem. Code § 101.021(2).

[2] The "peritoneal cavity" includes "[t]he space within the abdomen that contains the intestines, the stomach, and the liver." National Cancer Institute at the National Institutes of Health, https://www.cancer.gov/publications/dictionaries/cancer-terms?cdrid=46125.

[3] Perfusion is "[b]athing an organ or tissue with a fluid." National Cancer Institute at the National Institutes of Health, https://www.cancer.gov/publications/dictionaries/cancer-terms?search=perfusion.

intraperitoneal hyperthermic chemotherapy ("IPHC"). Finally, the bypass machine is disconnected, and the patient's peritoneal cavity is "washed out" with fluid to remove the chemotherapeutic agent.

In McKenzie-Thue's case, the chemotherapeutic agent, oxaliplatin, was combined with a water solution containing dextrose, called "D5W." MDACC provided both the oxaliplatin and the D5W. A total of 9 liters of fluid was perfused into McKenzie-Thue's abdominal cavity, but only 7.2 liters of fluid were accounted for after the procedure. MDACC surgeon Dr. Paul Mansfield was McKenzie-Thue's surgical oncologist and oversaw the details of the procedure. The procedure was performed at MDACC using MDACC personnel and equipment. However, a medical technician called a "perfusionist" perfused—under Mansfield's direction— the chemotherapeutic agent and the D5W into McKenzie-Thue's body. The perfusionist, Dwight Crawford, was employed by independent contractor Specialty Care, Inc., which MDACC engaged to perform such services. Dr. Mansfield performed the final step of McKenzie-Thue's procedure by washing out her peritoneal cavity with D5W.

McKenzie-Thue developed hyponatremia following completion of the procedure. Hyponatremia is a condition that occurs when the blood sodium level becomes abnormally low. This drop in sodium causes the body's water level to rise, leading to swelling of the cells. McKenzie-Thue was unresponsive following the procedure and was moved to MDACC's intensive care unit. Despite MDACC's efforts to counteract the hyponatremia, her brain swelled, resulting in her death two days after her surgical/chemotherapeutic regimen.

After her death, McKenzie-Thue's family (collectively, "appellees") sued MDACC, among others. Specifically, appellees alleged MDACC was negligent based on:

a) [MDACC]'s employees, including physicians and nursing and other personnel misusing a fluid, tangible personal property, for chemotherapy under circumstances where it was reasonably obvious that it was not the appropriate fluid and posed a significant risk of harm to the patient, including the exact condition from which Courtney died;

b) [MDACC]'s actions perfusing Courtney's body with tangible personal property, a substance known as D5W, basically a water solution also containing dextrose, causing injury and death;

c) [MDACC]'s using tangible personal and/or real property in treatment of Courtney, causing injury and death;

d) [MDACC]'s failure to conform to standards of "ordinary care", causing harm and death of Courtney;

e) [MDACC]'s negligent use of tangible personal property that was defective and/or inadequate;

f) [MDACC]'s and its employees negligently using suction and other equipment and failing to remove excessive fluid from Courtney post-treatment such that too much fluid was left to be re-absorbed into the bloodstream, aggravating hyponatremia and leading to brain herniation and death;

g) [MDACC]'s proceeding to apply a treatment to Courtney that was known to defendant's physicians to pose an extreme risk under which Texas law constitutes gross negligence.

To support their suit, appellees retained Dr. David Miller as a medical expert. Dr. Miller opined in an expert report that McKenzie-Thue developed hyponatremia and her death was caused, in reasonable medical probability, by the use or misuse of fluid that was perfused into her body.[4] He stated:

The perfusion of D5W fluid in association with any drug, including a chemotherapy agent, in large volumes to the abdominal cavity is known to be likely to cause an imbalance in sodium levels that leads to

[4] MDACC objected to Dr. Miller's expert report and sought to dismiss appellees' claim under Chapter 74 of the Texas Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem. Code § 74.351. But the trial court overruled MDACC's objections to the report and denied the motion to dismiss. MDACC has not appealed that ruling.

4

absorption of water into the blood stream, diluting the level of sodium in the blood, increasing the volume of water and causing edema (swelling) of the brain that poses an imminent danger of death. This misuse of the D5W solution should have been obvious to those treating her at M.D. Anderson Cancer Center, regardless of the circumstances.

Dr. Miller also opined:

Use of a large dose of D5W in perfusion of a patient in any condition exposes the patient to the danger of hyponatremia and death because this creates a situation where the patient's body is subjected to an imbalance of sodium in relation to blood, resulting in low sodium and too much water in the bloodstream, diluting the sodium in the bloodstream, causing edema that is critical in the area of the brain and causes death as what happened in this case.

MDACC filed a plea to the jurisdiction, asserting that the trial court lacked jurisdiction because it was immune from suit under the TTCA.[5] MDACC asserted that this lawsuit should be dismissed due to the plaintiffs' failure to show a waiver of sovereign immunity because:

(1) The tangible personal property complained of was actually used by a third-party contractor, not an employee of MDACC; and

(2) The testimony of Plaintiffs' expert establishes that the death of Courtney McKenzie-Thue was not "foreseeable," under the circumstances and so Plaintiffs cannot show proximate cause.

Specifically, MDACC alleged that perfusionist Crawford, an independent contractor, was the only person who "used" the D5W during McKenzie-Thue's procedure. MDACC also asserted that Dr. Miller stated that McKenzie-Thue's death was unexpected and not foreseeable; thus, her family could not show proximate cause. In support of its plea, MDACC attached, *inter alia*, documents detailing the

---

[5] Tex. Civ. Prac. & Rem. Code § 101.002.

Wake Forest protocol and deposition testimony from Dr. Miller, Crawford, and Dr. Mansfield.

Appellees responded to MDACC's plea to the jurisdiction by asserting that the D5W was "used and under the control of MDACC" and that Miller's testimony established that McKenzie-Thue's death was foreseeable under the circumstances. The appellees relied on, *inter alia*, the same documents and depositions as did MDACC.

The evidence presented in connection with the plea to the jurisdiction included the following. According to the Wake Forest protocol documentation, during the IPHC portion of the procedure "the [patient]'s abdomen will be gently massaged throughout the perfusion to improve drug distribution to all peritoneal surfaces." Additionally, hyponatremia is explicitly listed as an "adverse event" expected for trials involving the use of oxaliplatin, the chemotherapeutic agent used in McKenzie-Thue's case. The documentation further provides that "[r]econstitution or final dilution [of oxaliplatin] must never be performed with a sodium chloride solution or other chloride-containing solutions." The documentation provides that the infusion line "should be flushed with D5W prior to and after administration of any concomitant medication."

In his deposition, appellees' expert, Dr. Miller, stated that the use of the D5W throughout McKenzie-Thue's IPHC procedure, including the washout Dr. Mansfield performed at the end of the procedure, caused McKenzie-Thue's death. Dr. Miller stated that McKenzie-Thue's death resulting from the use of the D5W was "possible," but not "predictable." He opined that MDACC did not expect McKenzie-Thue to die, but acknowledged that MDACC was aware of a risk of "severe neurological damage, permanent -- permanent damage." Dr. Miller

6

acknowledged that Dr. Mansfield's decision to use the D5W was a "medical judgment."

The perfusionist, Crawford, stated that he was unaware that McKenzie-Thue had died after her procedure until he was contacted to provide a deposition in this case. Crawford explained that he was an employee of Specialty Care, Inc., which contracted with MDACC to provide perfusion services. Crawford read part of Specialty Care's contract with MDACC into the record, which provided that "MDACC will have full medical responsibility for its patients in general and specifically during the provision of these services." Crawford explained that MDACC's surgical oncologist, Dr. Mansfield, specified the substance and solution for perfusion. According to Crawford, the D5W was obtained from MDACC's supplies in the "central core" area of MDACC's operating rooms. Crawford added the "chemotherapeutic agent under the surgeon's orders," and he worked under MDACC's "prescription."

Crawford set up the perfusing equipment, checked with the surgeon regarding the agent and perfusing solution to be used, and helped the surgeon "hook up the equipment" to the patient. Crawford testified that Dr. Mansfield specified the use of the D5W, the flow rate for the perfusion, and the temperature for the perfusing fluid during the IPHC procedure. Crawford added fluid during the IPHC procedure and reported to Dr. Mansfield when he added fluid. Crawford explained that solution is added during an IPHC procedure because, while the solution is circulating through the patient, "a surgeon and a nurse or two surgeons are actually shaking the trunk or the belly of the patient. And in the course of that shaking, sometimes volume gets pushed a little higher or pushed a little lower."

According to Crawford's records, he stopped the perfusion pump at 4:26 p.m. and left the operating room (and MDACC) shortly thereafter. After Crawford

7

disconnected the pump, Dr. Mansfield washed out McKenzie-Thue's peritoneal cavity using the D5W. Crawford was not present when the washout occurred. According to Crawford, everything was "fine" when he left the operating room; there were "no alarms, no bells, no concern" from anyone. McKenzie-Thue's records indicate that she was transferred to the ICU at around 7:00 p.m.

Dr. Mansfield was also deposed. Dr. Mansfield acknowledged that Crawford made no decisions about the volume or type of fluid used during the perfusion process. Dr. Mansfield reported that the total time of McKenzie-Thue's surgery, including the resection and perfusion, was about ten hours.[6] She was transferred to the ICU following the surgery, where she was later discovered to have "fixed and dilated pupils," which indicated severe brain damage. A CT scan revealed that McKenzie-Thue suffered from brain herniation, which is swelling of the brain that causes the brain to push down through the opening for the spinal cord. Dr. Mansfield stated that the brain herniation was caused by hyponatremia and that the herniation caused her death. Dr. Mansfield also stated that the "electrolyte abnormalities" that occurred with the use of the D5W would not have occurred had they used a saline solution.[7] Dr. Mansfield acknowledged that using D5W would cause the patient's glucose level to increase and sodium level to decrease. He agreed that "[t]he

---

[6] McKenzie-Thue's surgery was extensive. Dr. Mansfield reported that he removed her spleen, gallbladder, and part of her small intestine and colon. He stated that he "stripped" the lining of the muscles on her diaphragm and the lining of her pelvis. Another surgeon, Dr. Schmeler, performed a complete hysterectomy, which consists of removing the uterus, fallopian tubes, and ovaries.

[7] Dr. Mansfield stated that the Wake Forest protocol mandated the use of D5W with the particular chemotherapeutic agent—oxaliplatin—with which McKenzie-Thue was treated. He noted that, subsequent to her death, researchers changed the protocol to indicate that normal saline could be used in the peritoneal cavity for perfusing the medication. However, he also acknowledged that the principal investigator of the Wake Forest study noted that Wake Forest had not been using D5W as the perfusing fluid or for washout; instead, Wake Forest had been using normal saline.

hyponatremia itself was caused by the use of the D5W."[8]  He also acknowledged that MDACC was aware that a rise in glucose and a drop in sodium was "expected" when using the D5W, which is why the surgical team used an insulin drip and hypertonic saline drip during the surgery.

Following a hearing, the trial court denied MDACC's plea to the jurisdiction. This appeal timely followed.

**Analysis**

MDACC presents the following issues for our review:

1. Whether sovereign immunity is waived for the use of tangible personal property by the employee of a third party entity or an alleged negligent medical judgment by a state employee.

2. Whether expert testimony alleging that injuries were made "possible" by a state employee's actions, but were not "foreseeable" or "predictable" can establish proximate cause for alleged injuries under the TTCA.

### A.     Standard of Review and Governing Law

The parties agree that MDACC is a governmental unit.  Governmental units, including governmental institutions as defined by the TTCA,[9] are entitled to immunity from suit for personal injuries unless immunity has been waived.  *Univ. of Tex. M.D. Anderson Cancer Ctr. v. Jones*, 485 S.W.3d 145, 148 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *Univ. of Tex. M.D. Anderson Cancer Ctr. v. King*, 329 S.W.3d 876, 879 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). A plaintiff bears the burden to plead facts showing a waiver of immunity.  *Jones*, 485 S.W.3d at 148.  If immunity is not waived, a trial court lacks subject matter

---

[8] Dr. Mansfield also agreed that "there's no question . . . that she did die from brain herniation secondary to hyponatremia."

[9] *See* Tex. Civ. Prac. & Rem. Code § 101.001(3)(D).

jurisdiction to hear the case. *Id.* (citing *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95 (Tex. 2012)).

A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject matter jurisdiction. *Harris Cty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). A plea questioning the trial court's jurisdiction raises a question of law that we review de novo. *State v. Holland*, 221 S.W.3d 639, 642 (Tex. 2007); *see also Jones*, 485 S.W.3d at 148. We construe the pleadings liberally in the plaintiff's favor, and we consider relevant jurisdictional evidence offered by the parties. *Jones*, 485 S.W.3d at 148; *see also City of Waco v. Kirwan*, 298 S.W.3d 618, 622 (Tex. 2009). "When, as here, evidence has been admitted that implicates the merits of the suit, we take as true all evidence favorable to the non-movant." *Jones*, 485 S.W.3d at 148. We indulge all reasonable inferences and resolve all doubts in favor of the non-movant. *Id.* If the evidence is undisputed or raises a fact issue regarding jurisdiction, then the governmental institution's plea must be denied because a fact finder must resolve the issue. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227-28 (Tex. 2004); *Jones*, 485 S.W.3d at 148 (citing *City of Houston v. Ranjel*, 407 S.W.3d 880, 887 (Tex. App.—Houston [14th Dist.] 2013, no pet.)). But if the pertinent evidence is undisputed or does not raise a fact issue, the court should rule on the plea as a matter of law. *Jones*, 485 S.W.3d at 148.

The TTCA provides a limited waiver of governmental immunity from suit. Tex. Civ. Prac. & Rem. Code § 101.021. Subsection 101.021(2), which controls the resolution of this appeal, waives immunity when a plaintiff's personal injury was "caused by a condition or use of tangible personal property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." *Id.* § 101.021(2).

With this framework in mind, we consider whether the trial court erred in denying MDACC's plea to the jurisdiction.

## B.  Appellees alleged and produced evidence that MDACC personnel "used" tangible personal property

MDACC first asserts that the D5W at issue was used not by its employee but by the perfusionist, Crawford, who was Specialty Care's employee. To properly state a claim involving a use of non-defective property, as we have here, a plaintiff must allege the property was used or misused by a government employee. *Lacy v. Rusk State Hosp.*, 31 S.W.3d 625, 629 (Tex. App.—Tyler 2000, no pet.). Section 101.021(2) waives immunity for claims involving the use of tangible personal property "only when the governmental unit itself uses the property"; a governmental unit's immunity is not waived "when it merely allows someone else to use" the property. *Black*, 392 S.W.3d at 97. "Use" in the context of section 101.102(2) means "to put or bring into action or service; to employ for or apply to a given purpose." *San Antonio State Hosp. v. Cowan*, 128 S.W.3d 244, 246 (Tex. 2004). As these principles form the crux of MDACC's initial argument, we first determine whether appellees alleged and provided some evidence that MDACC personnel used the D5W in this case.[10]

It is undisputed that MDACC provided the D5W for use during the procedure. It is likewise undisputed that MDACC's surgical oncologist, Dr. Mansfield, flushed McKenzie-Thue's body with the D5W during the washout portion of the procedure conducted at the end of the Wake Forest protocol. This constitutes legally sufficient evidence that MDACC "used" the D5W during the washout.

---

[10] That D5W constitutes tangible personal property is not contested.

Moreover, evidence supports the reasonable inference that MDACC used the D5W during the part of the IPHC protocol in which the patient's peritoneal cavity is perfused with the fluid mixture of D5W and the chemotherapeutic agent. For example, the surgeon manipulates the patient during an IPHC procedure in such a way as to better distribute the chemotherapeutic agent, mixed with the D5W, throughout the patient's peritoneal cavity. As Crawford testified, "a surgeon and a nurse or two surgeons are actually shaking the trunk or the belly of the patient" during the procedure. The Wake Forest protocol required that "the [patient]'s abdomen will be gently massaged throughout the perfusion to improve drug distribution to all peritoneal surfaces." This evidence supports a rational inference that MDACC personnel massaged McKenzie-Thue's abdomen during the IPHC procedure to "improve drug distribution" to her peritoneal surfaces. And the chemotherapeutic agent in this case was indisputably combined with the D5W. Thus, in the process of "shaking" or massaging McKenzie-Thue's abdomen, MDACC personnel, including Dr. Mansfield, employed the D5W essentially as a tool for the given purpose of improving the chemotherapeutic agent's distribution to McKenzie-Thue's peritoneal surfaces. This constitutes legally sufficient evidence that MDACC personnel used the D5W. *See Wise Reg'l Health Sys. v. Brittain*, 268 S.W.3d 799, 810 (Tex. App.—Fort Worth 2008, no pet.) (concluding that defendant "used" medications when nurses administered medicine when they should have refused to do so); *Salas v. Wilson Mem'l Hosp. Dist.*, 139 S.W.3d 398, 403 (Tex. App.—San Antonio 2004, no pet.) (district's improper use of medical equipment stated sufficient use of tangible property to waive immunity); *Angleton Danbury Hosp. v. Chavana*, 120 S.W.3d 424, 428 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (affirming denial of plea to jurisdiction when plaintiff alleged defendant's employee negligently used needle to inject hypertonic saline instead of local anesthetic); *see generally Tex. Tech Univ. Health Sci. Ctr. v. Mendoza*, No. 08-01-

12

00061-CV, 2003 WL 1359549, at *3 (Tex. App.—El Paso Mar. 20, 2003, pet. denied) (mem. op.) (immunity from suit waived under TTCA when plaintiff alleged injury from use of, among other things, fluid machine and surgical tools); *Denson v. T.D.C.J.-I.D.*, No. 12-02-00099-CV, 2003 WL 21254862, at *17 (Tex. App.—Tyler May 30, 2003, no pet.) (mem. op.) (immunity from suit waived when plaintiff alleged negligent use of medical equipment—a splint and bandage—caused injury).

Based on the present record, MDACC "put or brought into action" or "employed for a given purpose" the D5W during McKenzie-Thue's entire IPHC procedure. *See Cowan*, 128 S.W.3d at 246. Thus, we conclude that appellees alleged and presented some evidence that MDACC "used" the D5W.[11]

MDACC alternatively contends that appellees' claims against MDACC are claims for "errors in medical judgment disguised as use of tangible personal property." MDACC urges that claims challenging errors in medical judgment are barred by sovereign immunity. We agree with MDACC that allegations involving the misuse of information, negligent training, or medical judgment, without more, are insufficient to waive immunity. *Univ. of Tex. Med. Branch at Galveston v. York*, 871 S.W.2d 175, 179 (Tex. 1994) (concluding that medical information, even if recorded on paper, is not tangible personal property); *Kamel v. Univ. of Tex. Health Sci. Ctr. at Houston*, 333 S.W.3d 676, 686 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding that claims for errors in medical judgment or general medical negligence do not involve the use of tangible personal property).

---

[11] Citing our opinion in *Jones*, appellees also contend that MDACC used the D5W because Dr. Mansfield specified its use during the procedure and MDACC dispensed it to the perfusionist to administer. *See Jones*, 485 S.W.3d at 150-51 (holding that MDACC "used" a drug by prescribing and dispensing it to Jones and directing her to take it). We need not address this additional argument in light of our ruling.

For example, in *Kamel*, a patient brought a malpractice claim arising out of the state hospital's purportedly unnecessary removal of the patient's testicle. *Kamel*, 333 S.W.3d at 680. The patient attempted to invoke the waiver of immunity for negligent use of tangible personal property claims, asserting that the hospital's negligent use of surgical instruments caused the injury. *Id.* But the First Court of Appeals rejected that argument, holding that the "crux" of the dispute involved the hospital's "erroneous medical judgment . . . that [plaintiff]'s testicle needed to be removed." *Id.* at 686. The court observed that the plaintiff made no claim that the surgical instruments "were defective in any way or that they were used in a negligent manner," and therefore dismissed the lawsuit. *Id.*

But, viewing appellees' petition in its entirety to determine whether waiver under the TTCA exists, *see Jones*, 485 S.W.3d at 149, we conclude that the negligence of which appellees complain involves more than medical judgment. *Kamel* is distinguishable because, among other things, it did not involve a hospital specifying and dispensing tangible personal property—D5W—nor did the plaintiff claim that the doctor used the instruments in a negligent manner. *See Kamel*, 333 S.W.3d at 676. Here, in contrast, appellees alleged, and presented some evidence, that MDACC used D5W when it should not have been used, either separately or in conjunction with the medical equipment.[12] *See Jones*, 485 S.W.3d at 149 n.2. We thus conclude that the crux of appellees' allegations against MDACC involves more than complaints about medical judgment.

For the foregoing reasons, we overrule MDACC's first issue.

---

[12] Specifically, the family alleged that MDACC employees misused "a fluid, tangible personal property, for chemotherapy under circumstances where it was reasonably obvious that it was not the appropriate fluid and posed a significant risk of harm to the patient, including the exact condition from which [McKenzie-Thue] died."

14

**C. Appellees alleged and produced evidence that MDACC's use of the D5W proximately caused McKenzie-Thue's death**

MDACC further asserts that appellees cannot establish proximate cause for the alleged injuries under the TTCA. Section 101.021(2) waives immunity only when the claimant asserts—and presents evidence—that her personal injury was "proximately caused" by the State's use of tangible property. *Dallas Cnty. Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 342-43 (Tex. 1998). Mere involvement of tangible property in personal injury or death is not enough to waive liability. *Id*. at 342-43. A claimant may not invoke the waiver of immunity in section 101.021(2) when the State's use of property "does no more than furnish the condition that makes the [claimant]'s injury possible." *Id.* at 343; *accord Tex. Dep't of Crim. Justice v. Miller*, 51 S.W.3d 587, 588 (Tex. 2001) ("Miller's treatment might have furnished the condition that made the injury possible by suppressing symptoms that TDCJ staff otherwise could have recognized as meningitis, but the treatment did not actually cause his death. Neither the drugs nor the treatment afforded to Miller hurt him or made him worse, in and of themselves."). A plaintiff must show the tangible property to be the instrumentality of harm. *Bossley*, 968 S.W.3d at 342.

In *Bossley*, a patient at a treatment center operated by the Dallas County Mental Health and Mental Retardation Center escaped through an unsecured door and ran about a half-mile before throwing himself in the path of a truck on a freeway. *Id.* at 341. The negligence in that case was alleged to be the condition of the unlocked door, which allowed the patient to escape the hospital. *Id.* The Supreme Court of Texas rejected this theory, stating, "The unlocked doors permitted [the patient]'s escape but did not cause his death." *Id.* at 343.

15

And in *Miller*, the Supreme Court of Texas discussed the proximate cause requirement as it applies to drugs. *Miller*, 51 S.W.3d at 588. There, Miller, an inmate, was treated by the TDCJ's staff for nausea and severe headaches. *Id.* at 585. He received several medications before eventually being hospitalized and diagnosed with cryptococcal meningitis, which caused his death. *Id.* His widow sued TDCJ, alleging his death was caused by misuse of tangible property by TDCJ's improperly administering pain medication and fluids, which masked the symptoms of meningitis. *Id.* But the court held that, although TDCJ used various drugs while treating Miller, the fact that some property was involved was not enough. *Id.* at 588. Instead, the use of the property "must have actually caused the injury." *Id.* The court concluded that the treatment did not cause Miller's death or worsen his condition; instead, meningitis caused his death. *Id.*

But here, in contrast to the facts of *Bossley* and *Miller*, the record contains evidence that D5W caused McKenzie-Thue's hyponatremia, which in turn caused her death. Dr. Mansfield acknowledged that using D5W would cause a patient's blood glucose level to increase and her blood sodium level to decrease. He admitted that the hyponatremia was caused by using D5W. Indeed, he acknowledged that MDACC "expected" a rise in glucose and a drop in sodium from using the D5W, which is why the surgical team used an insulin drip and hypertonic saline drip during the surgery. The surgical team took these precautions specifically to reduce the risk of hyponatremia presented by using the D5W. No one, including MDACC's personnel, disputes that hyponatremia caused McKenzie-Thue's death. In short, there exists at least a genuine issue of material fact that D5W's use was an instrumentality that caused the hyponatremia resulting in McKenzie-Thue's death. There is some evidence that the D5W in itself hurt McKenzie-Thue and thus did

16

more than "merely furnish the condition that made her death possible." *Cf. Jones*, 485 S.W.3d at 152; *Wise*, 268 S.W.3d at 810.

Under these circumstances, we conclude that appellees alleged and provided evidence that MDACC's use of tangible personal property proximately caused McKenzie-Thue's death. We overrule MDACC's second issue.

## Conclusion

Appellees' pleadings and the evidence trigger a waiver of MDACC's governmental immunity under section 101.021(2). First, appellees have alleged and presented evidence that MDACC used tangible personal property during McKenzie-Thue's procedure. Second, appellees' allegations and evidence show some evidence of the requisite causal nexus between MDACC's use of tangible personal property and McKenzie-Thue's death.

Accordingly, we affirm the trial court's order denying MDACC's plea to the jurisdiction and remand this case to the trial court for further proceedings consistent with this opinion.


/s/    Kevin Jewell
Justice


Panel consists of Justices Christopher, Busby, and Jewell.