# IN THE SUPREME COURT OF TEXAS

No. 17-0730

THE UNIVERSITY OF TEXAS M.D. ANDERSON CANCER CENTER, PETITIONER,

v.

LANCE MCKENZIE, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF
COURTNEY MCKENZIE-THUE (DECEASED), AND DEBORAH DIVER, INDIVIDUALLY
AND AS NEXT FRIEND OF J.O., A MINOR, RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS

**Argued February 19, 2019**

JUSTICE LEHRMANN delivered the opinion of the Court, in which JUSTICE GUZMAN, JUSTICE BOYD, JUSTICE DEVINE, and JUSTICE BLACKLOCK joined.

CHIEF JUSTICE HECHT filed a dissenting opinion, in which JUSTICE GREEN and JUSTICE BROWN joined.

JUSTICE BUSBY did not participate in the decision.

The Texas Tort Claims Act waives governmental immunity for personal injury and death proximately caused by a condition or use of tangible personal property. In this case, before us on the defendant hospital's plea to the jurisdiction, we are asked whether the hospital's use of an allegedly improper carrier agent during surgery constitutes negligent "use" of tangible personal property and, if so, whether sufficient evidence was presented that this use proximately caused the patient's death. The trial court found that the plaintiffs sufficiently demonstrated both use and

proximate cause and accordingly denied the plea. The court of appeals agreed, affirmed the trial court's order, and remanded the case to the trial court for further proceedings.

In this Court the hospital argues that because the carrier agent was administered properly during surgery, the plaintiffs complain only of negligent medical judgment for which immunity is not waived. However, when, as here, the claim is premised on the hospital's use of property that was improper under the circumstances and caused harm, this is sufficient to establish negligent "use" under the Act, regardless of the manner in which the property was administered. We therefore affirm the court of appeals' judgment.

### I. Background

In 2011, Courtney McKenzie-Thue, then thirty-three years old, began treatment at M.D. Anderson Cancer Center (the "Hospital") for a rare cancer of the appendix. As part of this treatment, Courtney agreed to undergo a two-part procedure called a HIPEC (short for hyperthermic intraperitoneal chemotherapy).[1] The Hospital performed the procedure pursuant to a clinical trial protocol designed by Wake Forest Medical School (the Wake Forest protocol). The purpose of the protocol was to test the efficacy of two chemotherapy drugs: oxaliplatin and mitomycin C.

The first part of the HIPEC procedure involves the surgical removal of all visible cancer from the patient's peritoneal cavity.[2] The second part of the procedure involves flushing out, or perfusing, the patient with a chemotherapy drug mixed with another fluid. This second fluid serves

---

[1] The procedure is also referenced in various parts of the record and the parties' briefing as intraperitoneal hyperthermic chemotherapy, or IPHC, as well as hyperthermic intraperitoneal chemoperfusion and intraperitoneal hyperthermic chemoperfusion. The names appear to be interchangeable.

[2] The peritoneal cavity is the space within a person's abdomen that contains the intestines, stomach, and liver. *Peritoneal Cavity*, National Cancer Institute Dictionary of Cancer Terms, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/peritoneal-cavity.

as a carrier agent, helping to disperse the chemotherapy drug throughout the patient's peritoneal cavity. When the perfusion is complete, the patient is washed out with the carrier agent alone to remove any trace of the chemotherapy drug.

Courtney was randomly selected to receive the chemotherapy drug oxaliplatin. Pursuant to the Wake Forest protocol, the Hospital used a sugar water solution, called D5W, as the carrier agent. Dr. Paul Mansfield, an M.D. Anderson surgical oncologist, oversaw the procedure.[3]

As the Hospital acknowledges, D5W can cause hyponatremia, a condition that occurs when the body's blood sodium level becomes too low. This drop in sodium levels causes the body's water level to rise, which leads to swelling of the cells. To counteract this electrolyte imbalance, the Hospital administered an insulin and saline IV drip during surgery. Despite these efforts, Courtney developed hyponatremia following completion of the procedure. As a result, she experienced swelling in her brain, which in turn caused brain herniation. Courtney died from these injuries two days after her surgery.

After Courtney's death, her family[4] sued the Hospital for negligence.[5] Specifically, the McKenzies alleged that the Hospital was negligent in

> misusing a fluid, tangible physical property, for chemotherapy under circumstances where it was reasonably obvious that it was not the appropriate fluid and posed a significant risk of serious harm to the patient, including the exact condition from which Courtney died.

---

[3] The Hospital hired a medical technician called a perfusionist to operate the pump during the second part of Courtney's procedure. However, the perfusionist worked under Dr. Mansfield's direction.

[4] The plaintiffs include Courtney's father, Lance McKenzie, and her mother Deborah Diver, individually and on behalf of Courtney's minor son.

[5] The McKenzies also sued Wake Forest and the two physicians responsible for publishing the Wake Forest protocol. The claims against these defendants are not at issue here.

The McKenzies further alleged that the "conduct of MD Anderson's employees that proximately caused Courtney's death was misuse of tangible personal property . . . for which the State of Texas has waived sovereign immunity."

To support these claims, the McKenzies timely filed an expert report prepared by Dr. David Miller, a board-certified internal medicine specialist. *See* TEX. CIV. PRAC. & REM. CODE § 74.351 (requiring a health care liability claimant to serve an expert report on each defendant no later than 120 days after the date the defendant's original answer is filed). Dr. Miller opined that Courtney's death was caused, in reasonable medical probability, by the "misuse of fluid that was perfused into [her] body." He explained:

> Use of a large dose of D5W in perfusion of a patient in any condition exposes the patient to the danger of hyponatremia and death because this creates a situation where the patient's body is subjected to an imbalance of sodium in relation to blood, resulting in low sodium and too much water in the bloodstream, diluting the sodium in the bloodstream, causing edema that is critical in the area of the brain and causes death as what happened in this case.

He further opined:

> [I]t is clear and in reasonable medical probability, that this patient would not have died from brain herniation secondary to hyponatremia secondary to intra-operative complications as explained above had she not been perfused with the wrong substance that led to hyponatremia and brain herniation . . . . [T]he perfusion of a large volume of D5W solution into a patient's abdominal cavity, regardless of other circumstances and regardless of the reason for the perfusion, exposes the patient to a risk of developing hyponatremia and death from brain herniation.

The Hospital filed a plea to the jurisdiction, asserting that the Hospital is immune from suit. It argued that the McKenzies failed to show waiver of immunity under the Tort Claims Act because (1) the D5W was used by an independent contractor (the perfusionist), not the Hospital, and (2) Courtney's death was not foreseeable under the circumstances, so the McKenzies could

4

not show proximate cause. In support of its plea, the Hospital attached the protocol documents promulgated by Wake Forest, as well as the deposition testimony of Dr. Miller and Dr. Mansfield.[6]

Following a hearing, the trial court denied the Hospital's plea to the jurisdiction. The Hospital then timely filed an interlocutory appeal. *See id.* § 51.014(a)(8) (authorizing an interlocutory appeal from an order that grants or denies a plea to the jurisdiction by a governmental unit). At the court of appeals, the Hospital again argued that the D5W was used only by the third-party perfusionist and not by Hospital employees. However, the Hospital alternatively argued that the McKenzies' claims are not for negligent use of property (for which immunity would be waived), but rather are premised on errors in medical judgment disguised as use of tangible personal property. The court of appeals affirmed, holding that the "crux of [the McKenzies'] allegations against [the Hospital] involves more than complaints about medical judgment" and that the McKenzies "alleged, and presented some evidence, that [the Hospital] used D5W when it should not have been used." 529 S.W.3d 177, 187 (Tex. App.—Houston [14th Dist.] 2017).[7]

Regarding proximate cause, the court of appeals held that the record "contains evidence that D5W caused [Courtney's] hyponatremia, which in turn caused her death." *Id.* at 188. Specifically, the court of appeals cited Dr. Mansfield's testimony that he knew D5W could cause a patient's blood sodium level to decrease, and that he expected such a drop to occur. *Id.* The

---

[6] The depositions of Dr. Crawford, the perfusionist, and Dr. Fournier, an M.D. Anderson surgical oncologist, were also attached to the plea. However, the Hospital does not rely on that testimony to support the issues presented in this Court.

[7] The court of appeals also held that the Hospital, not the third-party perfusionist, used the D5W because (1) the Hospital provided the D5W to the perfusionist, (2) Dr. Mansfield used the D5W during the final washout portion of the procedure, and (3) the Hospital "used" the D5W when it manipulated Courtney's body to better distribute the drug throughout her peritoneal cavity. 529 S.W.3d at 185–86. The Hospital does not challenge this holding here.

court thus concluded that a genuine issue of material fact exists as to whether the use of the D5W proximately caused Courtney's death. *Id.*

In this Court, the Hospital argues its immunity was not waived because (1) the McKenzies failed to show that the Hospital negligently "used" tangible personal property and (2) Courtney's death as a result of the D5W's use was unforeseeable. We will address each issue in turn.

## II. Standard of Review

"Governmental immunity generally protects municipalities and other state subdivisions from suit unless the immunity has been waived by the constitution or state law." *City of Watauga v. Gordon*, 434 S.W.3d 586, 589 (Tex. 2014). A claim of immunity is properly raised by a plea to the jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004). The purpose of a plea to the jurisdiction is to "defeat a cause of action without regard to whether the claims asserted have merit." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). We review an appellate court's ruling on a plea to the jurisdiction de novo. *Miranda*, 133 S.W.3d at 226.

The Tort Claims Act waives the state's immunity for certain negligent acts by governmental employees.[8] *See* TEX. CIV. PRAC. & REM. CODE § 101.021. A party suing the governmental unit bears the burden of affirmatively showing waiver of immunity. *See Tex. Dep't of Criminal Justice v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001). To determine whether the party has met this burden, we may consider the facts alleged by the plaintiff and the evidence submitted by the parties. *Tex. Nat. Res. & Conservation Comm'n v. White*, 46 S.W.3d 864, 868 (Tex. 2001). In doing so, we "construe the plaintiff's pleadings liberally, taking all factual assertions as true,

---

[8] The parties do not dispute that the Hospital is a governmental unit.

and look to the plaintiff's intent." *Heckman v. Williamson County*, 369 S.W.3d 137, 150 (Tex. 2012). "If the evidence raises a fact question on jurisdiction," we cannot grant the plea, "and the issue must be resolved by the trier of fact." *Univ. of Tex. at Austin v. Hayes*, 327 S.W.3d 113, 116 (Tex. 2010). However, "if the evidence is undisputed or fails to raise a fact question, the plea must be granted." *Id.*

### III. Analysis

### A. Use of Tangible Personal Property

The Tort Claims Act waives immunity for:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

    (A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

    (B) the employee would be personally liable to the claimant according to Texas law; and

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

TEX. CIV. PRAC. & REM. CODE § 101.021. Construing section 101.021's substantively similar predecessor statute, we have explained that waiver of immunity under subsection (2) requires negligence or a wrongful act or omission of an officer or employee acting within the scope of his employment, where the negligent conduct "involve[s] 'some condition or some use' of tangible personal property under circumstances where there would be private liability." *Salcedo v. El Paso Hosp. Dist.*, 659 S.W.2d 30, 33 (Tex. 1983).

7

Generally speaking, then, immunity may be waived when an employee (1) furnishes property in a defective or inadequate condition causing injury or (2) improperly uses otherwise non-defective property to cause injury. *See id.* at 32. To "use" property in this context means "to put or bring [the property] into action or service; to employ for or apply to a given purpose." *San Antonio State Hosp. v. Cowan*, 128 S.W.3d 244, 246 (Tex. 2004). A claim of "mere non-use" is insufficient to waive immunity; actual use is required. *See Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 584 (Tex. 1996). Here, the Hospital does not dispute that it actually used tangible personal property. Rather, the issue presented in this case is whether actual use of non-defective property is sufficient to establish waiver where the complaint is not that the property was administered incorrectly, but that it should not have been used in the first place.

In determining whether a plaintiff has stated a claim for use of tangible personal property, we look to the true nature of the dispute—a plaintiff may not expand the Act's limited waiver through artful pleading. *See Dallas Cty. Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 343 (Tex. 1998) (holding that the "real substance of plaintiffs' complaint [was] that [the patient's] death was caused, not by the condition or use of property, but by the failure of [the hospital's] staff to restrain him" and thus was a claim of non-use for which immunity was not waived); *see also Kerrville*, 923 S.W.2d at 585–86 (holding that the claim involved non-use because the "gravamen" of the plaintiff's complaint was that "a different form of treatment . . . would have been more effective," not that the property that was actually used caused any harm).

In the instant case, the McKenzies claim that the Hospital's actual use of tangible personal property caused harm. However, the Hospital argues that the gravamen of the McKenzies'

8

complaint is that the Hospital negligently exercised its medical *judgment*, not that it negligently used property. That is, because the McKenzies do not complain about the manner in which the Hospital administered the D5W—but instead allege that the decision to use the D5W in the first place was improper—this is a claim regarding medical judgment, and the Tort Claims Act does not waive immunity for such claims. The dissent similarly opines that "[b]ecause the McKenzies' negligence claim centers on [the Hospital's] decision to use D5W . . . [and] not the manner in which [the Hospital] administered the D5W," the alleged error is one of medical judgment for which immunity is not waived. *Post* at ___.

However, neither the dissent nor the Hospital offers an explanation grounded in the Tort Claims Act's language to support this assertion. The Act does not narrow the definition of use to encompass only the manner of administration, nor does it limit the scope of the waiver to "use" that is not preceded by medical judgment. *See Cowan*, 128 S.W.3d at 246 (explaining that the ordinary meaning of "use" is "to put or bring into action or service; to employ for or apply to a given purpose"). The suggestion that "use" of property transforms into medical judgment so long as the property is administered correctly simply is not supported either by the statute's plain language or, as discussed below, by our precedent.

As such, we disagree with the Hospital's characterization of the McKenzies' claims as being unrelated to its use of property. While the McKenzies do not allege the D5W was administered incorrectly during surgery, they do allege that the Hospital was negligent in using the D5W in the first instance "under circumstances where it was reasonably obvious that it was not the appropriate fluid and posed a significant risk of serious harm." In other words, the McKenzies complain about the Hospital's use of property under circumstances where it (1) should not have been used at all

9

and (2) caused harm. This is as much a claim for negligent use of property as a claim that the D5W was improperly administered would have been. That the subsequent administration followed protocol does not somehow negate any negligence in using the property in the first place.

While we have never addressed the issue directly, we have indicated that the use of medication that is improper under the circumstances and causes harm constitutes negligent "use" under the Tort Claims Act. *See Kerrville State Hosp.*, 923 S.W.2d at 584. Although *Kerrville* involved the distinction between use and non-use of property, we nevertheless find it instructive. In that case, we were asked to determine whether immunity was waived for a claim involving the hospital's dispensing an oral, rather than injectable, form of medication to a patient. *Id.* In holding that immunity was not waived, we focused on the fact that the plaintiffs had neither alleged nor presented evidence that the oral form of medication provided caused any harm. *Id.* at 585. We concluded that "the gravamen of their complaint [was] that [the hospital's] non-use of an injectionable drug was the cause of" the harm. *Id.* This distinction—that the property actually used (the oral form of the drug) did not cause the injury at issue—is what rendered the waiver for injuries caused by the use of tangible personal property inapplicable. *See id.*[9]

By contrast, here the McKenzies allege and have presented evidence that the Hospital used property (the D5W) that should not have been used *and* that the D5W is what harmed Courtney. Under our reasoning in *Kerrville*, this is sufficient to waive immunity. *See Univ. of Tex. M.D. Anderson Cancer Ctr. v. Jones*, 485 S.W.3d 145, 149 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (holding that immunity was waived for a claim that the hospital negligently prescribed and

---

[9] The dissent (as it must) ignores this critical piece of our reasoning in *Kerrville* in erroneously asserting that it is "irreconcilable" with today's holding. *Post* at ___.

10

dispensed a drug that should not have been provided to the patient due to her history with depression); *see also Wise Reg'l Health Sys. v. Brittain*, 268 S.W.3d 799, 805–07 (Tex. App.—Fort Worth 2008, no pet.) (holding that immunity was waived for a patient's claims that nurses administered medication when they should not have done so).

The Hospital relies extensively on *Kamel v. University of Texas Health Science Center at Houston* for the proposition that this case concerns only a medical decision that is insulated from suit. 333 S.W.3d 676, 679 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). In *Kamel*, a patient underwent surgery to remove an accumulation of fluid around his testicle. *Id.* However, during the surgery, the doctor decided to remove the testicle altogether because he believed it was cancerous. *Id.* Tests later revealed that the doctor was wrong; the testicle was not cancerous. *Id.* The patient sued and alleged that immunity was waived because the doctor "negligently used tangible personal property, namely a scalpel, scissors, and/or other surgical instruments to negligently . . . remov[e] plaintiff's right testicle." *Id.* at 680. The court of appeals held that the true nature of the patient's claim was not that the surgical instruments were defective or used improperly, but that the doctor made an erroneous medical judgment in removing the testicle. *Id.* at 686. Importantly, the injury would have occurred regardless of the method used—i.e., whether the surgeon used "a scalpel, scissors . . . or other surgical instrument" to remove the testicle. *Id.* at 680, 686. Accordingly, the patient's claims did not fall within section 101.021(2)'s limited waiver. *Id.* at 686.

While we agree that a complaint about medical judgment, without more, is insufficient to waive immunity, the negligence alleged here does not involve only medical judgment. In this regard *Kamel* is distinguishable. There, the negligence complained of was the surgeon's decision

11

to remove the testicle, not his choice of property to accomplish that task. Indeed, as stated above, the injury—removal of the non-cancerous testicle—would have occurred regardless of the method or instrument used to carry out that decision. That is, the fact that some form of tangible personal property had to be used to effectuate the improper medical decision is simply not relevant; it was the decision itself, regardless of whether property was used or whether it was administered properly, that caused the injury. *See id.*; *see also Univ. of Tex. Health Sci. Ctr. at Tyler v. Smith*, No. 12-18-00270-CV, 2019 WL 1960251, at \*4 (Tex. App.—Tyler Apr. 30, 2019, no pet.) (mem. op.) (finding no waiver where the patient's complaint was not that the surgical instrument was used incorrectly, but that removal of her gallbladder was unnecessary).

By contrast, the negligence complained of in this case is that the Hospital's use of a specific carrier agent was improper under the circumstances and caused harm; absent the use of that particular carrier agent, the injury would not have occurred. *See Hopkins v. Spring Indep. Sch. Dist.*, 706 S.W.2d 325, 327 (Tex. App.—Houston [14th Dist.] 1986) (noting that waiver has been found "when the injuries are alleged to have proximately resulted from the negligent use of property in some respect deficient or inappropriate for the purpose for which it was used"), *aff'd*, 736 S.W.2d 617 (Tex. 1987). In other words, it was the use itself that caused the injury, and the fact that the property was administered properly or that the use of the D5W was preceded by medical judgment does not affect the analysis.

This distinction is further illustrated in *University of Texas M.D. Anderson Cancer Center v. Jones*. 485 S.W.3d at 147–49. In that case, a patient participated in a hospital's smoking cessation study designed to test the efficacy of two medications, Chantix and Zyban, to help people quit smoking. *Id.* at 147. Both medications carried possible side effects, including depression and

suicidal ideation. *Id.* Before participating in the study, the patient disclosed that she had previously struggled with depression. *Id.* The hospital nonetheless accepted the patient into the study and instructed her to take the drug Chantix. *Id.* After a few weeks of taking the drug as directed, the patient attempted suicide and suffered permanent nerve and renal damage as a result. *Id.*

The patient filed suit against the hospital and alleged that her injuries were caused by the hospital's "negligently screening her, admitting her into the study, and prescribing and dispensing Chantix when it knew or should have known that she should not be given the drug due to her history of depression." *Id.* at 148. In response, the hospital claimed the patient failed to establish waiver under section 101.021(2) because the true nature of her allegations was that the hospital negligently exercised its medical judgment when it allowed her to participate in the study. *Id.* at 148–49. The court of appeals disagreed, holding that although the patient "include[d] allegations of negligent medical judgment . . . in her pleadings, she also allege[d] that the consequence of those errors was the negligent prescribing and dispensing of a drug that caused her injuries." *Id.* In other words, the *Jones* patient did not merely challenge the hospital's judgment in screening her; she challenged the hospital's dispensing of medication that allegedly should not have been provided to her at all and caused her injury. *See id.*

Similarly here, the McKenzies allege that the Hospital should never have used the D5W as a carrier agent given the large doses required for the HIPEC procedure. The fact that the use of the agent was preceded by a medical professional's decision to do so is of no consequence given that virtually every action (or inaction) taken by a medical professional is preceded by medical judgment. The key is that while medical judgment was involved, it led to the use of property that

13

was allegedly improper under the circumstances and caused harm. This is sufficient to establish waiver under the Tort Claims Act, as any other reading would effectively write the use-of-property waiver out of the statute.

The Hospital further insists that because the McKenzies do not complain about how the D5W was administered—only that is was used at all—this is a case of "mere involvement" of tangible personal property that is insufficient to waive immunity. *See Bossley*, 968 S.W.2d at 343. However, in the cases from which the Hospital extracts this language we were explaining that the "requirement of *causation* is more than mere involvement." *See id.* (emphasis added) (holding that a patient's death "was caused, not by the condition or use of property" but by the hospital's failure to restrain the patient); *see also Miller*, 51 S.W.3d at 588 (holding that while the governmental unit used various drugs while treating a patient, the use of these drugs did not cause his injury). In other words, a plaintiff cannot invoke waiver merely by alleging use of tangible personal property; the use of the property must also cause his injury. However, this well-settled proposition does not affect our analysis here. No one contends that the Hospital's use of a stethoscope during Courtney's treatment waived its immunity, because no one contends that the use of this instrument was causally related to Courtney's death. Rather, the carrier agent allegedly caused the injury.

Finally, the Hospital argues that allowing waiver for the McKenzies' claims would "effectively eliminate the State's sovereign immunity in claims challenging medical judgment" and thus "expose the State to considerable liability, given the countless medical decisions that take place every day involving non-negligent use of tangible property." The dissent echoes this

14

assertion, contending that our decision renders the sovereign immunity doctrine a "nullity." *Post* at ___ (quoting *Kerrville*, 923 S.W.2d at 586).

This floodgate argument is unsupported and paints our holding in overly broad strokes. As our jurisprudence demonstrates, not every tort claim involving medical providers will arise from the improper use of tangible personal property that causes harm. *See, e.g.*, *Univ. of Tex. Med. Branch at Galveston v. York*, 871 S.W.2d 175, 179 (Tex. 1994) (holding that immunity is not waived for negligence involving the use, misuse, or nonuse of information in a patient's medical record); *see also Kerrville*, 923 S.W.2d at 586 (holding that the alleged failure to prescribe a specific form of medication is not "use"). As discussed, a patient cannot merely allege that a medical provider used tangible personal property during treatment; the patient must also demonstrate that the use of the particular property at issue was both improper under the circumstances and caused injury. *See Miller*, 51 S.W.3d at 588 (holding that immunity was not waived because "[n]either the drugs nor the treatment afforded" to the inmate "actually cause[d] his death," as the inmate's condition became fatal due to the doctor's incorrect diagnosis); *Kamel*, 333 S.W.3d at 686 (finding no waiver for negligent removal of a testicle where the negligent conduct—the decision to remove the non-cancerous testicle—was unrelated to the property used to carry out that decision). Causation is key because it forecloses the flood of liability the dissent fears will ensue.

To the contrary, it is the dissent's interpretation that has overly broad implications and renders section 101.021(2) largely useless. The dissent agrees with the Hospital that for immunity purposes, we must separate the *decision* to use particular property from the subsequent physical manipulation of the property. That is, the dissent would hold that causing harm by improperly

administering the right property does not involve medical judgment and thus constitutes negligent or wrongful use of property under the Act's use waiver, while causing harm by properly administering the wrong property does involve medical judgment and thus cannot be negligent use under the Act. *Post* at ___. We fail to see the textual basis for that distinction.

Indeed, we recently rejected a similar categorical analysis in *Tarrant Regional Water District v. Johnson*. 572 S.W.3d 658 (Tex. 2019). In that case, we applied the Tort Claims Act's discretionary function exception, under which the government retains immunity for claims involving discretionary decisions. *Id.* at 664–65; TEX. CIV. PRAC. & REM. CODE § 101.056. The court of appeals applied a strict "design versus maintenance" approach that had developed in our jurisprudence with respect to the exception, wherein anything on the "design" side of the line would be covered by the exception and anything on the "maintenance" side would not. *Johnson*, 572 S.W.3d at 665. While we recognized that "[those] labels provide useful conceptual frameworks that aid courts and litigants in the application of the rather obscure text" of the Tort Claims Act, we ultimately concluded that this "design versus maintenance" framework was "not an element of the statute"; accordingly, the court of appeals' "[n]arrow consideration of whether the claim involve[d] a design function or a maintenance function" could not displace the statute's "textual touchstone: 'discretion.'" *Id.* at 665, 667–68. Similarly here, the Hospital's and the dissent's proposal—that "use" transforms into medical judgment when the property is administered properly but nevertheless causes harm—adds language to section 101.021 that does

16

not appear anywhere in its text. Our analysis must be driven not by the Hospital's creative labeling, but by the provision's "textual touchstone": use.[10]

Finally, we reiterate that the issue before us today is immunity, *not* liability. The Hospital's compliance with the applicable standard of care has no bearing on our analysis. We are called upon only to determine whether, looking at the gravamen of the plaintiffs' complaint, a fact issue exists regarding whether Courtney's injury was proximately caused by the Hospital's "use" of tangible personal property. For the reasons discussed, we hold that the McKenzies' claim against the Hospital is not premised solely on the exercise of medical judgment for which immunity would not be waived. Rather, the McKenzies adequately alleged that the Hospital used property that was improper under the circumstances and that such use caused harm. This constitutes a claim for which section 101.021(2) waives immunity.

## B. Proximate Cause: Foreseeability

The Hospital next argues that, even if the McKenzies have adequately alleged negligent use of property, the Hospital retains its immunity because the record evidence establishes as a matter of law that the use of D5W did not proximately cause Courtney's death. *City of Dallas v. Sanchez*, 494 S.W.3d 722, 726 (Tex. 2016) (explaining that to establish waiver under section 101.021(2), the condition or use of the property must be a proximate cause of the injury). Proximate cause has two components: cause in fact and foreseeability. *Id.* Because proximate cause is ultimately a question for the factfinder, on a plea to the jurisdiction we need only determine whether the evidence creates a fact question regarding the causal relationship between the use of

---

[10] Insofar as there may or may not be policy reasons to further restrict the scope of the immunity waiver, that is not our decision to make. The Legislature drew the line by waiving immunity for injuries proximately caused by negligent "use" of tangible personal property and makes no exception when the "use" is precipitated by the exercise of medical judgment.

property and the resulting injury. *Ryder Integrated Logistics, Inc. v. Fayette County*, 453 S.W.3d 922, 929 (Tex. 2015).

The Hospital does not dispute that the D5W was a cause in fact of Courtney's death, arguing only that proximate cause is lacking because Courtney's death was not a foreseeable result of using the D5W.[11] The Hospital advances two arguments that it claims foreclose foreseeability: (1) Courtney's death was a "possibility" but was not "predictable" and (2) the precautions taken to prevent Courtney from developing hyponatremia rendered any risk of death unforeseeable. Essentially, the Hospital contends that Courtney's death was unforeseeable because it was unlikely. We disagree.

In making its argument, the Hospital relies almost exclusively on an excerpt from the deposition of the McKenzies' expert, Dr. Miller, in which he stated that he did not think Courtney's death was foreseeable. However, this answer is divorced from its context. The entirety of Dr. Miller's testimony on this issue is as follows:

> Q: Based on that statement [in the Hospital's expert witness designation], you believe that Courtney's death at M.D. Anderson was foreseeable to the doctors there?
>
> A: Oh I don't think [it was] foreseeable. I think that with her – the use of that amount of sugar water, that it was a possibility; but I don't think it was predictable.
>
> Q: They didn't expect her to die?
>
> A: No. Not –
>
> Q: But it was definitely a risk?
>
> A: It was a risk, yes, or severe neurological damage, permanent – permanent damage.

---

[11] While the Hospital addressed the cause-in-fact component in its brief, it conceded the issue at oral argument and confirmed that it disputed only foreseeability.

Q: And according to [the expert witness designation], they were well aware of that risk?

A: Yes.

Dr. Miller's testimony is consistent with his expert report, in which he repeatedly explained how and why death can result from hyponatremia. First, Dr. Miller opined that the Hospital's use of the D5W breached the relevant standard of care because it "expose[d] the patient to the danger of developing hyponatremia and death [by] creat[ing] a situation where the patient's body is subjected to an imbalance of sodium . . . causing edema that is critical in the area of the brain and causes death." Dr. Miller then opined that this breach caused Courtney's death because "the perfusion of a large volume of D5W solution into a patient's abdominal cavity, regardless of other circumstances . . . exposes the patient to a risk of developing hyponatremia and death from brain herniation." Thus, it is clear that, in Dr. Miller's expert opinion, a recognized consequence of hyponatremia is serious neurological damage or death, and that Courtney's death was in fact caused as a result of her developing this condition.

Indeed, the testimony of Dr. Mansfield, the surgical oncologist who performed the procedure, draws the same causal link as the McKenzies' expert:

Q: What condition did [Courtney] have that led to her brain herniation?

A: She had cerebral edema.

Q: Okay. What caused [that]?

. . . .

A: It was a result of her hyponatremia.

At a later point in his deposition, Dr. Mansfield again confirmed that there was "no question" that Courtney died of a brain herniation secondary to hyponatremia. He also admitted that the D5W caused her hyponatremia and that D5W is known to create electrolyte abnormalities—abnormalities that would not have resulted had a saline solution been used.

Foreseeability does not necessarily equate to predictability. Rather, "foreseeability" means that the actor should have reasonably anticipated the dangers that his negligent conduct created for others. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992); *see also Ryder*, 453 S.W.3d at 929. It "does not require that a person anticipate the precise manner in which injury will occur once he has created a dangerous situation through his negligence." *Travis*, 830 S.W.2d at 98. It requires only that "the general danger, not the exact sequence of events that produced the harm, be foreseeable." *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996); *see also Ryder*, 452 S.W.3d at 929 (holding that the "injury [must] be of such a general character as might reasonably have been anticipated"). Accordingly, the plaintiff need not always show that his particular injury has occurred before in order to create a fact question on foreseeability. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 551 (Tex. 1985) (holding that evidence of previous sexual assaults was not necessary to create a fact issue on foreseeability and that a history of other violent crimes in the area was sufficient).

Here, while the McKenzies' expert stated that he did not think Courtney's death was predictable, he also testified that the risks associated with using the D5W were "basic medicine":

> Q: In your opinion, should M.D. Anderson have known that the D5W was a mistake?
>
> A: Oh, yes.
>
>            . . . .

20

Q: And why is that?  Is it because of what you told us earlier, that –

A: Yes, because of the large . . . volume of sugar water being placed in the abdominal cavity, which you just don't do.

. . . .

Q: And is that basic medicine?

A: That's basic medicine.

Moreover, the Hospital concedes that it knew the use of D5W could cause hyponatremia.  Indeed, it implemented a saline and insulin drip precisely because it expected such a condition to result.  It is therefore clear that, at a minimum, the general dangers associated with the use of the D5W were known to Courtney's doctors.[12]  This evidence is sufficient to raise a fact issue on foreseeability.

And the precautionary measures taken to prevent hyponatremia do not negate foreseeability.  The Hospital insists that, because Courtney's doctors administered a saline and insulin drip during surgery, her injuries were unforeseeable.  The dissent similarly argues that because the Hospital took steps to minimize the risks associated with injecting sugar water into Courtney's body, her death was unforeseeable.  *See post* at ___.  But reducing risk is not the same as eliminating it.

The dissent further opines that our conclusion that a fact issue exists on proximate cause amounts to "strict liability" for healthcare providers whose patients suffer injury despite the efforts

---

[12] The dissent focuses on the fewer than fourteen instances in which Dr. Mansfield had previously performed the HIPEC procedure using oxaliplatin and D5W, none of which resulted in the patient's death.  *See post* at ___.  But the question of foreseeability asks only whether the actor should have "anticipated the dangers that his negligent act created for others."  *Travis*, 830 S.W.2d at 98.  "The test is not what the [defendant] believed would occur," nor does it "require that he anticipate just how injuries will grow out of that dangerous situation."  *Clark v. Waggoner*, 452 S.W.2d 437, 440 (Tex. 1970).  Again, no one disputes that the *hyponatremia* was foreseeable, and that this condition carried serious risks, including brain herniation and death.  The fact that the ultimate outcome (death) was unexpected is therefore not dispositive given that the dangerous condition leading to this outcome (hyponatremia) was not.

made to minimize the risks of treatment. This assertion mischaracterizes not only our analysis, but the fundamentals of tort law. Specifically, the dissent has overlooked the fact that the Hospital will not be held liable on the McKenzies' negligence claim unless and until a factfinder determines that the Hospital breached the applicable standard of care *and* that the breach proximately caused the injury. *See Rourke v. Garza*, 530 S.W.2d 794, 800 (Tex. 1975) (explaining that under a strict liability theory, "[a] finding of negligence is not required," and one may be liable "even though he has exercised all possible care"). As noted, whether the Hospital was or was not negligent is well beyond the scope of the immunity issue before us. And we certainly recognize that the actions taken by the Hospital to address the risk inherent in using the D5W are relevant to both negligence and causation. Addressing the issue at hand, we hold only that these actions do not conclusively negate foreseeability on this record.

In sum, after considering the evidence in the light most favorable to the McKenzies, *Miranda*, 133 S.W.3d at 228, we hold that a fact issue exists on foreseeability. As such, the Hospital's plea to the jurisdiction was properly denied. *Id.*

## IV. Conclusion

The court of appeals correctly held that the Tort Claims Act waives the Hospital's sovereign immunity. We accordingly affirm the court's judgment.

_____
Debra H. Lehrmann
Justice

**OPINION DELIVERED:** June 28, 2019

22