**Affirmed and Memorandum Opinion filed January 29, 2021.**



In The

# Fourteenth Court of Appeals

### NO. 14-19-00031-CV

**PEDIATRICS COOL CARE, JOSE J. SALGUERO, M.D., PA, JOSE J. SALGUERO, M.D., AND JENELLE ROBINSON, P.A.-C., Appellants**

**V.**

**GINGER THOMPSON, INDIVIDUALLY AND AS THE REPRESENTATIVE OF THE ESTATE OF A.W. (DECEASED), AND BRAD WASHINGTON, Appellees**

**On Appeal from the 40th District Court
Ellis County, Texas
Trial Court Cause No. 88970**

## MEMORANDUM OPINION

This is an appeal from a jury verdict in a medical malpractice and wrongful death action brought by appellees, Ginger Thompson, individually and as the representative of the estate of A.W. (deceased), and Brad Washington against appellants Pediatrics Cool Care, Jose J. Salguero, M.D., P.A., Jose J. Salguero, M.D., and Jenelle Robinson, P.A.-C., resulting in a judgment in favor of appellees.

Appellants present multiple issues contesting the judgment. For the reasons stated, we affirm the judgment of the trial court.

## I. BACKGROUND

In 2010, Ginger Thompson's ("Thompson") and Brad Washington's ("Washington") daughter, A.W., who was twelve years old, began receiving treatment as a patient at Pediatrics Cool Care ("PCC"), a full-service pediatric clinic located in Ennis, Texas.[1]

Jose J. Salguero, M.D. ("Dr. Salguero") is the lead physician at PCC; he does business as PCC through his professional association, Jose J. Salguero, M.D., P.A. Dr. Salguero is responsible for overseeing all employees and caregivers in his practice, including nurse practitioners, physician assistants, and medical assistants. During the relevant time, Allyn Kawalek, R.N., F.N.P.-B.C.[2] ("Kawalek") and Jenelle Robinson, PA-C[3] ("Robinson"), worked, respectively, as a nurse practitioner and a physician's assistant under the supervision of Dr. Salguero at PCC.

At PCC, medical records are created by the physician's assistant or the nurse practitioner by dictating the relevant information into the telephone; the dictation is then be transcribed by a third-party company located in New Mexico. The physician's assistants and family nurse practitioners log in to the dictation service under Dr. Salguero's login number. The physician assistants and nurse

---

[1] The Texas Supreme Court ordered the Tenth Court of Appeals to transfer this case to this court. We must therefore decide the case in accordance with the precedent of the Tenth Court of Appeals if our decisions otherwise would have been inconsistent with that court's precedent. *See* Tex. R. App. P. 41.3.

[2] Kawalek is a registered nurse with family nurse practitioner specialization and is board certified.

[3] Robinson is a physician assistant and is certified.

practitioners do not review or sign off on their medical records; instead, all records, are electronically signed by Dr. Salguero whether he reviewed the record or not. Separate and apart from the physician's assistant and nurse practitioner, there are seven medical assistants at PCC, each with their own login numbers with respect to medical records, who are permitted to enter the patient's vital signs and other triage information into a patient's medical record; the medical assistants were not supposed to diagnose patients, treat patients, perform medical coding, or issue prescriptions, without Dr. Salguero's permission.

Between October 2010 and January 2012, A.W. was seen by different healthcare providers at PCC for a variety of ailments (*e.g.*, fractured finger, dysmenorrhea, sore throat, and acne) and was evaluated multiple times for gastrointestinal complaints, including vomiting and abdominal migraines as well as migraine headaches. Thompson, A.W.'s mother, always accompanied A.W. during her appointments.

*March 1, 2012, office visit*

On March 1, 2012, A.W. went to PCC with her mother and was evaluated by Robinson. At that time, A.W. complained of depression, stating that she felt sad all the time, that she could not control her feelings, that she cried while watching television commercials, and that she was stressed out. Thompson indicated to Robinson that A.W.'s depression had been going on for some time. Thompson stated there was a family history of depression and bipolar disorder and that Thompson herself was taking Celexa for depression.

Robinson spent less than thirty minutes evaluating A.W. Robinson did not perform a detailed psychiatric work-up on A.W. or use the depression questionnaire that was available; she diagnosed A.W. with depressive disorder and prescribed a 30-day supply of Celexa (20mg/day). Celexa is an antidepressant

3

medication with a "black box" warning label that Celexa has a significant risk of serious adverse effects, including suicidal ideation. Robinson did not specifically recall the visit, but maintains she always gives the warning when prescribing Celexa, including possible suicide ideation and that the patient needs to be watched closely when starting the medication. Robinson further asserts that she gave Thompson the name and number of counselors in the area, and strongly recommended that A.W. get counseling. Robinson wrote in her notes that A.W. was to return to PCC for a follow-up appointment in one week. Robinson did not recall telling the receptionist to schedule an appointment for A.W. in one-week.

Thompson denied that Robinson gave her names of area counselors; however, Thompson admitted looking for a counselor and then deciding not to send A.W. to one after A.W. indicated she did not want to see a counselor. Thompson denied that anyone instructed her to schedule a follow-up appointment for A.W. within one week.

Without Robinson's knowledge, a medical assistant at PCC changed A.W.'s medical record from a diagnosis by Robinson of depression to "depression, not otherwise specified." Additionally, Robinson did not prescribe any refills of Celexa but the medical assistant sent the pharmacy the 30-day prescription plus three refills—approximately 120 days or four months. The prescription that was sent to the pharmacy, as opposed to the one Robinson intended, exceeded what Robinson could prescribe for Celexa under PCC policies and Drug Enforcement Administration regulations. Robinson did not see the changes the medical assistant made in A.W.'s medical record until after the lawsuit was filed in 2014 because PCC did not have a policy or procedure in place for the physician assistants or nurse practitioners to review medical records after they were transcribed.

*April 17,2012, office visit*

On April 17, 2012, A.W. returned to PCC complaining of a migraine and was seen by Kawalek. At that time, only prior office visit notes regarding A.W. were available to Kawalek. A.W. indicated that she had not had a migraine for a month and a half, and the medication previously prescribed (*i.e.*, Relpax) had "knocked it out"; however, A.W. needed a note for school. Kawalek performed a well-child visit, noting that both A.W. and Thompson had noticed a huge positive change in A.W.'s mood since beginning Celexa. Kawalek assessed A.W. with migraines, depressive disorder, and acne. Kawalek continued the Celexa prescription. Kawalek did not question the prescription or suggest A.W. follow-up with Robinson concerning her depression diagnosis.

After Kawalek dictated A.W.'s medical record, the record was altered by someone else in the office to add the phrase "Patient is to come back in 30 days for follow-up." The record was altered on March 4, 2014, according to the electronic medical record access log but was electronically signed by Dr. Salguero on March 7, 2014.

*July 31, 2012, telephone call and refill*

On July 31, 2012, Thompson called PCC and asked for a refill of A.W.'s Celexa prescription. At that time, Bernadette Aguillon ("Aguillon"), a medical assistant at PCC, spoke to Thompson and told her that she would call in a prescription for a 30-day supply and three refills. Aguillon looked at A.W.'s chart and noticed that A.W. had not been in the office since April of 2012. Aguillon allegedly tried to call Thompson back to tell her A.W. needed to return to PCC but she was not able to speak with her. Aguillon was not authorized to issue prescriptions and did not have permission from any of the providers at PCC to issue A.W.'s refills. Nevertheless, Aguillon refilled the prescription.

On August 14, 2012, A.W. was found unresponsive in her room and later pronounced dead. An autopsy documented her cause of death as suicide from a Benadryl overdose.

Aguillon learned of A.W.'s suicide from her daughter who went to school with A.W. The following day, Aguillon viewed A.W.'s chart to confirm she had been a patient and to review what treatment had been provided at the clinic. A week or so later, Washington contacted PCC and requested copies of A.W.'s medical records. All records requests to PCC went to Sylvia Lopez, the assistant manager at PCC, and she accessed A.W.'s records to make a copy for Washington.

*Procedural History*

On February 26, 2014, appellees filed this medical malpractice case against PCC, Dr. Salguero, M.D., P.A., Dr. Salguero, M.D., Robinson, and Kawalek, alleging negligence and gross negligence relating to the care and treatment rendered to A.W. on or about March 1, 2012, April 17, 2012, and July 31, 2012. Appellees assert appellants were negligent in a variety of ways, including but not limited to, at the time of prescribing the anti-depressant Celexa, appellants' failure to: discuss with A.W. or Thompson the black box warning; inform A.W. and Thompson to read the package insert to the anti-depressant; inform them that A.W. should be closely monitored while taking the anti-depressant; inform them that A.W. should be evaluated by a psychiatrist or psychologist; warn them that Celexa was linked to an increased risk of suicide. Appellees also alleged that appellants failed to monitor A.W. once the Celexa had been prescribed and refilled the medication over the phone without further evaluating A.W. Appellees further alleged that Dr. Salguero failed to properly oversee and monitor his physician assistant and nurses regarding prescribing medications, such as Celexa, to

6

adolescent patients. Appellees alleged as a result of such negligence, A.W. committed suicide on August 14, 2012.

Additionally, appellees alleged that PCC and/or the P.A. was vicariously liable for the conduct of Dr. Salguero, Robinson, and Kawalek, and any nurses and medical staff, and that PCC and/or P.A. was directly negligent. Appellees brought wrongful death claims seeking compensatory damages, including mental anguish and pecuniary loss. Thompson also brought survival claims as Representative of the Estate of A.W., seeking various compensatory damages. Appellees sought exemplary damages.

In May 2018, a jury trial commenced. At trial, appellees elicited expert testimony from Herschel Robert Lessin, M.D. ("Dr. Lessin"), a board-certified pediatrician, regarding the standard of care for the healthcare providers at PCC, and expert testimony from Fred Moss, M.D. ("Dr. Moss"), a board-certified psychiatrist, regarding causation. Appellees also elicited testimony from an economic expert, Justin Blok ("Blok"). Appellants retained Armando Correa, M.D. ("Dr. Correa"), an assistant professor in the Department of Pediatrics at Baylor College of Medicine in Texas Children's Hospital, to testify regarding the standard of care and causation.

On May 22, 2018, the jury returned a verdict in favor of appellees, answering question 1 "Yes" as to whether the negligence of Dr. Salguero, M.D. and Robinson proximately caused the death of A.W., but "No" as to Kawalek. In response to question 2, the jury assessed 75% responsibility to Dr. Salguero, 25% to Robinson, and 0% to Kawalek. Additionally, the jury determined that Jose

7

Salguero, M.D., Robinson, and Kawalek acted as employees of PCC. The jury reached a multi-million-dollar verdict against appellants.[4]

On September 25, 2018, the trial court signed a Final Judgment in favor of appellees. The Final Judgment rendered a $1.35 million dollar judgment against appellants.[5]

Appellants filed post-trial motions, including a Motion for New Trial or, Alternatively, Motion for Remittitur, Motion for Judgment Notwithstanding the Verdict, and Motion to Modify, Correct and/or Reform the final judgment, all of which were denied. This appeal timely followed.

## II. ANALYSIS

Appellants raise six issues on appeal.

- Whether the jury's answers to question no. 1 finding causation are supported by legally and factually sufficient evidence.

- Whether the jury's answer to question no. 1 finding Dr. Salguero negligent is supported by legally and factually sufficient evidence.

- Whether the jury's answers to question no. 2 are supported by legally and factually sufficient evidence.

---

[4] The jury awarded Thompson $10,000.00 for past pecuniary loss, $500,000.00 for future pecuniary loss, $100,000.00 for past loss of companionship and society, $1,000,000.00 for future loss of companionship and society, $100,000.00 for past mental anguish and $1,000,000.00 for future mental anguish. The jury awarded Washington $25,000.00 for past pecuniary loss, $500,000.00 for future pecuniary loss, $200,000.00 for past loss of companionship and society, $2,000,000.00 for future loss of companionship and society, $200,000.00 for past mental anguish and $2,000,000.00 for future mental anguish. In total, the jury awarded damages of $7,635,000.00 in favor of appellees against appellants.

[5] The trial court awarded Thompson a total of $593,333.33 in actual damages, and prejudgment interest in the amount of $21,364.38, and awarded Washington a total of $691,666.67 in actual damages, and prejudgment interest in the amount of $43,873.29. The judgment also provided for an award of court costs, and post-judgment interest at the annual rate of five percent (5%), compounded annually, from September 25, 2018, until paid in full.

- Whether the trial court abused its discretion by admitting Dr. Moss's opinions and pre-March 2012 evidence of negligence.

- Whether the jury's answers to question no. 4 are supported by legally and factually sufficient evidence.

- Whether the trial court's judgment correctly calculated prejudgment interest.

## A.   SUFFICIENCY OF THE EVIDENCE

In their first, second, third and fifth issues, appellants challenge the legal and factual sufficiency of the evidence.

### 1.   STANDARD OF REVIEW

We consider the legal-sufficiency challenge first. *See Windrum v. Kareh*, 581 S.W.3d 761, 777–79 (Tex. 2019). When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would supports it. *City of Keller v. Wilson*, 168 S.W.3d 802, 821–22, 827 (Tex. 2005); *see also Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam). The evidence is legally sufficient if it would enable a reasonable and fair-minded person to reach the verdict under review. *Wilson*, 168 S.W.3d at 827. "If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so." *Id*. at 822. "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *Id*. There is "no evidence" or legally insufficient evidence when (a) there is a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *See id*. at 810. "Ordinarily, a court of appeals will not address the factual sufficiency of the evidence if it determines the

9

evidence is legally insufficient." *Windrum*, 581 S.W.3d at 781; *see generally Wilson*, 168 S.W.3d at 810 (distinguishing between the legal and factual sufficiency standards, explaining that legal sufficiency review generally disregards contrary evidence and factual sufficiency review weighs all evidence).

When reviewing a challenge to the factual sufficiency of the evidence, however, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). After considering and weighing all the evidence, we set aside a verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *See id.*; *Del Lago Partners, Inc. v. Smith*, 206 S.W.3d 146, 160 (Tex. App.—Waco 2006), *aff'd*, 307 S.W.3d 762 (Tex. 2010). "We may not substitute our own judgment for that of the factfinder, even if we would reach a different answer." *Gunn v. McCoy*, 489 S.W.3d 75, 84 (Tex. App.—Houston [14th Dist.] 2016), *aff'd*, 554 S.W.3d 645 (Tex. 2018). "The amount of evidence necessary to affirm the factfinder's judgment is far less than that necessary to reverse its judgment." *Id.*

We apply these standards mindful that this court is not a fact finder. *Ellis*, 971 S.W.2d at 407. The trier of fact is the sole judge of the witnesses' credibility and the weight afforded their testimony. *See Wilson*, 168 S.W.3d at 819.

**2. JURY'S ANSWERS TO QUESTION NO. 1 FINDING CAUSATION ARE SUPPORTED BY SUFFICIENT EVIDENCE**

In their first issue, appellants argue that the jury's answers to Question No. 1 (subparts 1 and 2) that Dr. Salguero, M.D.'s and Robinson's negligence

proximately caused the death of A.W. are not supported by legally or factually sufficient evidence.[6]

### a. GOVERNING LAW

In a medical malpractice case, the plaintiff is required to show evidence of a reasonable medical probability that the injury was proximately caused by the defendant's negligence. *Jelinek v. Casas*, 328 S.W.3d 526, 532–33 (Tex. 2010) (citing *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 399–400 (Tex. 1993)); *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 860 (Tex. 2009). The plaintiff must prove the existence of a legal duty, breach of that duty, and damages proximately caused by the breach. *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017) (citing *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004)); *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 352 (Tex. 2015); *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013).

The components of proximate cause are (1) cause-in-fact and (2) foreseeability. *Windrum*, 581 S.W.3d at 777–79; *Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 518 (Tex. 2019). "A defendant's action is the cause in fact of damages if it was a substantial factor in causing the injury and without which the injury would not have occurred." *Anderson v. Durant*, 550 S.W.3d 605, 618 (Tex. 2018) (internal quotations omitted); *see Windrum*, 581 S.W.3d at 778–79. Whether a particular act of negligence is a cause-in-fact of an injury is a particularly apt question for jury determination. *Farley v. MM Cattle Co.*, 529 S.W.2d 751, 756 (Tex. 1975).

---

[6] Robinson does not dispute the duty and breach elements of appellees' cause of action. Dr. Salguero challenges the jury's finding that he was negligent in issue two.

Foreseeability exists when "the actor should have reasonably anticipated the dangers that his negligent conduct creates for others." *McKenzie*, 578 S.W.3d at 519. It "does not require that a person anticipate the precise manner in which injury will occur once he has created a dangerous situation through his negligence." *Id*. (quoting *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992)). Instead, foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable. *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996); *see Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001) (determining whether the wrongful act "was 'a' proximate cause, not 'the' proximate cause" of decedent's death). Thus, the question of foreseeability involves a practical inquiry based upon "common experience applied to human conduct." *City of Gladewater v. Pike*, 727 S.W.2d 514, 518 (Tex. 1987) (internal citation omitted).

A plaintiff is neither required to establish causation in terms of medical certainty nor is the plaintiff required to exclude every other possible hypothesis. *See Kramer*, 858 S.W.2d at 405. The plaintiff is required to prove only that it is "more likely than not" that the injury was caused by the negligence of one or more defendants. *See id*. The jury has broad latitude to infer proximate cause from the evidence and the circumstances surrounding the injury-producing act, especially when it is not possible to produce direct proof of proximate cause or lack of proximate cause. *J.K. & Susie Wadley Research Inst. & Blood Bank v. Beeson*, 835 S.W.2d 689, 698 (Tex. App.—Dallas 1992, writ denied) (citation omitted).

Both the breach of the standard of care and proximate cause must be established through expert testimony. *See Jelinek*, 328 S.W.3d at 533.

### i. APPELLEES' EVIDENCE

*Dr. Lessin (standard of care)*

At trial, Dr. Lessin testified as to the standards of care for the healthcare providers at PCC and testified regarding their deviation from such standards. Dr. Lessin testified that on March 1, 2012, Robinson breached the standard of care in several ways, including by: attempting to treat A.W. on her own without consulting Dr. Salguero; failing to interview A.W. more extensively and outside of the presence of Thompson; failing to use standard pediatric questionnaires for assessment of depression in adolescents; prescribing Celexa without conducting a sufficient interview to justify use of the medication; failing to elicit a promise from A.W. that she will tell someone if she feels like hurting herself; and providing A.W. with a thirty-day prescription for Celexa with three refills without requiring her return for an evaluation within seven days. Dr. Lessin further testified that in regard to that same visit, the medical assistant fell below the standard of care by altering the diagnosis dictated by Robinson from depression to depression not otherwise specified and by altering the prescription from a 30-day supply to a 30-day supply with three refills. Additionally, Robinson's treatment fell below the standard of care because she failed to review the medical records after the records were transcribed. Dr. Lessin also testified that the medical assistants breached the standard of care by altering A.W.'s April office visit record by adding "[p]atient to come back in 30 days for follow up."

Additionally, with regard to the July 31, 2012, telephone request for a refill of the Celexa prescription, Dr. Lessin testified that Aguillon breached the standard of care by issuing a prescription she was not authorized to make, by failing to seek and obtain Dr. Salguero's approval before issuing a refill, and by failing to require A.W. to return to PCC for evaluation prior to obtaining a refill.

The evidence pertaining to Dr. Salguero's breach of the standard of care is discussed below in connection with appellants' issue two.

*Dr. Moss (causation)*

Dr. Moss adopted Dr. Lessin's standard of care opinions and relied on them in formulating his causation options. Dr. Moss testified regarding the multiple failures of appellants in treating A.W. Dr. Moss testified that, based upon a reasonable medical probability, more likely than not, the actions and omissions of Dr. Salguero and Robinson on March 1, 2012, April 17, 2012, and on July 31, 2012, in combination, proximately caused A.W.'s suicide.[7]

Dr. Moss explained that Robinson's failure to conduct an appropriate interview of A.W. about the cause of her depression was just the first of three opportunities PCC had to adequately address A.W.'s depression. Had a proper interview been conducted, additional treatment options should have been employed which would have, more likely than not, prevented A.W. from committing suicide. Further, the lack of proper follow-up after the initial diagnosis of depression in seven days and frequently thereafter, essentially left A.W. without medical supervision after March 1, 2012. Realizing the error, Aguillon altered A.W.'s medical records to state that Thompson was instructed to bring A.W. in for a follow up within thirty days—something that was added to A.W.'s medical record after this lawsuit was filed. Finally, Dr. Moss testified that there was absolutely no excuse for a mental health care provider to provide a refill of Celexa for 120 days without requiring A.W. to return to PCC for an evaluation of her depression.

---

[7] In his overall opinions regarding causation, Dr. Moss also opined that Kawalek's actions or omissions, along with Dr. Salguero's and Robinson's, were a proximate cause of A.W.'s suicide. Because it answered "no" as to Kawalek in question number 1, the jury necessarily found, however, that either Kawalek was not negligent or that her negligence was not a proximate cause of A.W.'s suicide, or both.

14

On cross-examination, Dr. Moss explained:

My testimony is about that we didn't get any of the information necessary upon getting a chief complaint of depression for five months and we have a dead 14 year old here. And we have a dead 14 year old because nothing was done except throwing a pill at her and saying good-bye. That's my testimony.

There were many questionnaires and many pathways that were not pursued, and I say, in my professional opinion for 39 years or 30 years of experience, that had they been pursued, more likely than not [A.W.] would not have committed suicide on August 14th, 2012, though I can't guarantee that.

Dr. Moss testified that there was no one thing that Dr. Salguero or Robinson did that caused A.W.'s suicide; instead, Dr. Moss testified that it was a cluster of a cumulative number of things. He further testified that had Dr. Salguero and Robinson done what they should have for treatment of A.W. that it was "more likely than not [A.W.] would not have committed suicide, but she certainly could have."

When asked if it would be speculation to opine on what could have been done differently since he did not know why A.W. committed suicide, Dr. Moss testified:

Psychiatry is predicated really on getting answers to questions that I outlined early so that we can get optimal outcomes and optimize the welfare of our patients. In this case, [A.W.] was not given an opportunity to get that kind of care and I have no idea what August 13th would have looked like or August 14th would have looked like because nobody was with [A.W.] prior to her committing suicide at all.

No professionals had been monitoring her either medically or psychiatrically or in a mental health version. There had been no schoolmates. There had been no medical support. There had been no contract with [A.W.] specifically for several months. There had virtually been no contact with [A.W.'s] parents for several months.

> There had been medications given to her that had black box warnings. There had been many different things that were missed that could have been done. And there's no way I can know today what that would have led to had I had any bit of that information prior to August 14th. So that doesn't look like speculation to me.

Dr. Moss testified that he based his opinion in this case on his education, training, and experience.

### ii.    APPELLANT'S EVIDENCE

### *Dr. Correa (standard of care and causation)*

Dr. Correa, appellants' testifying expert, testified that Dr. Salguero, Robinson, and Kawalek were not negligent in their treatment of A.W. He further testified that the proximate cause of A.W. taking her life was "an impulsive, unpreventable act that she, herself, did and that the care that was provided by the three defendants [had] no bearing in this act." He stated that his opinions were based on a reasonable degree of medical probability based on his education, training, and experience.

Under cross-examination, Dr. Correa acknowledged many shortfalls by Dr. Salguero, Robinson, and PCC in the treatment of A.W. Dr. Correa admitted that screening an adolescent for depression should take place outside the presence of the parent. When conducting the private interview, Dr. Correa also admitted that a clinician should ask the patient if she has had suicidal thoughts. Dr. Correa agreed with Dr. Salguero's testimony that A.W. was displaying symptoms of depression prior to March 1, 2012, which were red flags. Dr. Correa further admitted that Dr. Salguero was responsible for the physician assistant, nurse practitioner, and medical assistants, and that Aguillon should not have altered A.W.'s medical records after learning of A.W's suicide and further, that such changes were a violation of Texas law.

Additionally, Dr. Correa teaches physician assistants and family nurse practitioners to review their medical records and to sign off on them and close them so that they cannot be altered. Dr. Correa admitted that the clinic fell below the standard of care when Aguillon issued a refill for A.W.'s prescription for Celexa without first requiring her to come in for a follow-up examination. Dr. Correa admitted that PCC fell below the standard of care by not requiring the clinicians to review their medical records for accuracy and that Dr. Salguero, as the supervising physician, fell below the standard of care by failing to review the medical records of the healthcare providers under his supervision. The failure to have A.W. return for an examination prior to issuing a refill for the Celexa was a breach of the standard of care. Finally, Dr. Correa admitted that if a patient with moderate to severe depression is not properly treated, it is foreseeable that the patient may commit suicide.

### b. APPLICATION

Appellants argue there is legally and factually insufficient evidence of causation. Appellants attempt to show insufficiency by analyzing proximate cause by isolating each visit of A.W. to PCC. We apply the substantial factor test. *See Bustamante*, 529 S.W.3d at 457 (rejecting the application of stringent "but-for" causation requirement and applying substantial-factor test). "It has long been the law in this state that a defendant's act or omission need not be the sole cause of an injury, as long as it is a substantial factor in bringing about the injury." *Id*. "There may be more than one proximate cause of an injury." *Id*.

Appellants argue that A.W.'s suicide is too attenuated from appellants' negligence to constitute evidence of proximate cause. *See Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013) (concluding no evidence that Goss's involuntarily hospitalization by defendant probably would have prevented her

17

suicide); *Providence Health Ctr. v. Dowell*, 262 S.W.3d 324, 328 (Tex. 2008) (holding that "the defendants' negligence was too attenuated from the suicide to have been a substantial factor in bringing it about"). Here, relying on Dr. Lessin's testimony of substandard care of A.W., which a reasonable jury could have believed, Dr. Moss's opinion was that appellants' individual acts of negligence were all substantial factors in A.W.'s death. Dr. Moss testified that the combined negligence of appellants in diagnosing, educating, treating, and monitoring (or failing to monitor) A.W. was a proximate cause of her suicide; and if appellants had complied with the standard of care, she would, in reasonable probability, still be alive. Dr. Moss testified that appellants collectively mismanaged A.W.'s diagnosis and treatment of her depression and that these acts and omissions, taken together, were a proximate cause of A.W.'s death.

Next, appellants assert that A.W.'s suicide was not foreseeable, thereby depriving appellees of causation. In support of their contention, appellants note Thompson acknowledged that A.W. had improved after beginning Celexa on March 1, 2012, and that A.W. seemed happy the night before her suicide. However, foreseeability does not require that a person anticipate the precise manner in which injury will occur once he has created a dangerous situation through his negligence. *McKenzie*, 578 S.W.3d at 519 (internal citations omitted). "It requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable." *Id.* In this case, all of the experts agreed that failure to properly treat depression in an adolescent patient like A.W. can foreseeably lead to suicide. Dr. Moss testified that A.W.'s suicide was foreseeable and with proper treatment, more than likely would not have occurred.[8] Contrary to appellants' contention, there is evidence of causation.

---

[8] As a subset of their first issue, appellants maintain that the causation opinions of Dr.

18

After hearing the testimony of both parties' expert witnesses and reviewing the trial exhibits, including A.W.'s medical record (both altered and unaltered exhibits), the jury determined that appellants' actions or omissions were a substantial factor in causing A.W.'s death. *See Farley*, 529 S.W.2d at 756. In considering the evidence in the light most favorable to the jury's verdict and crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not, we conclude that legally sufficient evidence supports the jury's proximate cause findings against Dr. Salguero and Robinson.

In challenging factual sufficiency, appellants fail to apply the substantial factor test and review each visit of A.W. in isolation, arguing that the evidence was "too weak" to support the jury's finding of negligence. *See Bustamante*, 529 S.W.3d at 457. Applying the proper causation test, Dr. Lessin testified as to appellants failure to treat A.W.'s depression in accordance with the standard of care on March 1, 2012, and thereafter. Dr. Moss, relying on this testimony, testified that the multiple failures of appellants in treating A.W.'s depression, in combination, proximately caused A.W.'s suicide. Dr. Moss testified to opportunities appellants had available that could have treated A.W.'s depression that he believes, based on a reasonable medical probability, would have prevented her suicide.

Dr. Moss supported his opinion with examples–*e.g.*, had a proper interview been conducted on March 1, 2012, additional treatment options should have been employed which would have, more likely than not, prevented A.W. from

Moss should be rejected because the testimony is speculative, conclusory, and unreliable. Similarly, appellants allege in their fourth issue that the trial court erroneously admitted testimony from Dr. Moss that was unreliable, speculative, and conclusory, likely leading to the rendition of an improper judgment. Appellants' contentions regarding the admissibility of Dr. Moss's expert testimony is analyzed under appellants' fourth issue.

19

committing suicide. Dr. Moss explained the treatment options available to A.W. would be based on answers to questions that were not asked in A.W.'s case. If questions had been asked and answered, they would have created pathways towards treatment options that would be made available and would have prevented her from committing suicide. Some of the options Dr. Moss testified would likely be made available, even on a broad scale, included psychotherapy or counseling. Additionally, Dr. Moss testified that other options, including designing a network of support in the community in the form of counselors, coaches, teachers, friends, neighbors, or family members can go far to reduce psychiatric symptomology. He further discussed other types of treatment plans, including nutritional counseling or even group therapy, that might have been helpful. Moreover, he testified that there are ways to manage psychiatric uncomfortable symptomology through creative arts, music, sports, clubs, peer groups, mentoring, physical activity, meditation, or even creating a confidential advocate or even an emergency telephone contact. Dr. Moss went on to discuss the lack of proper follow-up treatment, including not requiring any follow-up appointments while continuing to fill and refill a Blackbox prescription, essentially leaving A.W. without medical supervision after March 1, 2012.

Dr. Correa testified that appellants were not negligent and were not the proximate cause of A.W. taking her life. Dr. Correa further testified that based on a reasonable degree of medical probability the cause of A.W.'s suicide was "an impulsive, unpreventable act that she, herself, did and that the care that was provided by [appellants] have no bearing in this act."

Here, the evidence, and the inferences the jury could derive from the evidence, are factually sufficient to support the jury's findings on causation. Further, the evidence does not demonstrate that the jury's determination of

causation was clearly wrong or unjust, but rather it was a decision based upon the competing evidence. *See Wilson*, 168 S.W.3d at 826.

We conclude there is legally and factually sufficient evidence to support the jury's answers to Question No. 1. Appellants' first issue is overruled.

### 3. JURY'S ANSWERS TO QUESTION NO. 1 FINDING DR. SALGUERO NEGLIGENT IS SUPPORTED BY SUFFICIENT EVIDENCE

In their second issue, appellants argue that we should reverse the judgment as to Dr. Salguero and render judgment because the evidence is legally insufficient to support the jury's answer to Question No. 1, subpart 1, regarding the negligence of Dr. Salguero. Appellants contend that there is no evidence that Dr. Salguero was negligent in any way and that his liability is merely vicarious. Appellants assert that Dr. Salguero did not see A.W. on March 1, or April 17, 2012, and Dr. Salguero did not speak with A.W.'s mother on July 31, 2012; thus, appellants argue there is no conduct of Dr. Salguero constituting negligence. Alternatively, Dr. Salguero challenges the factual insufficiency of the evidence to support the jury's negligence finding against him.

Appellees, however, alleged that Dr. Salguero was negligent in failing to oversee and monitor his physician assistants, medical assistants, and nurse practitioners in the treatment of A.W. Dr. Salguero admitted that he is responsible for the acts of those in his employ and that he is responsible for making sure they treat patients appropriately. As set forth above, after Robinson dictated her medical record and diagnosed A.W. with depression and ordered a prescription of Celexa for thirty days, the medical assistants at PCC changed the record. The records reflect that the medical assistants changed A.W.'s diagnosis from depression to depression, not otherwise specified and sent in a prescription that exceeded Robinson's authority to prescribe the medication. Additionally,

21

Robinson did not prescribe any refills of Celexa but the medical assistant sent the pharmacy the 30-day prescription plus three refills. Dr. Lessin testified that Dr. Salguero's lack of appropriate supervision was below the standard of care.

Moreover, appellants' own expert, Dr. Correa, admitted that Dr. Salguero fell below the standard of care by not requiring the clinicians to review their medical records for accuracy and the failure of Dr. Salguero to review the medical records of the healthcare providers is negligence. This would include the failure of the clinicians to have A.W. return for an examination prior to issuing a refill for the Celexa, which both Dr. Correa and Dr. Lessin testified was a breach of the standard of care.

This evidence is legally sufficient to support the jury's negligence finding against Dr. Salguero.

In challenging factual sufficiency, appellants contend the overwhelming weight of the evidence showed that Dr. Salguero was not negligent. They argue "any alleged breach regarding the electronic medical record is no basis to support Dr. Salguero's liability or any percentage of responsibility." They further assert that none of A.W.'s office visits prior to March 1, 2012 had any causal connection to A.W.'s suicide and Dr. Salguero did not treat A.W. or speak to Thompson any time thereafter. Thus, appellants maintain there is "no conduct of Dr. Salguero constituting negligence."

Dr. Salguero admitted that he is responsible for the acts of those in his employ and that he is responsible for making sure they treat patients appropriately. He testified that he is supposed to review the family nurse practitioners in their treatment of patients. He further acknowledged that he is responsible for making sure that nurse practitioners are making the right decisions on behalf of the children. Additionally, he conceded that he is responsible for making sure they

prescribe the correct medication for the children they are treating in his office. He also testified that he is responsible for diagnosis of the children that are treated at PCC. He testified that he is required to review the work of the nurse practitioners. Dr. Salguero admitted that he is responsible for making sure that his physician assistant and nurse practitioner give the type of quality care that the children who visit the clinic come in for. Dr. Salguero acknowledged that he did not meet with the nurse practitioner and review A.W.'s chart.

We conclude that the evidence does not demonstrate that the jury's negligence finding against Dr. Salguero was clearly wrong or unjust, but rather it was a decision based upon the competing evidence. *See Wilson*, 168 S.W.3d at 826.

We conclude there is legally and factually sufficient evidence to support the jury's answers to Question No. 1. Appellants' second issue is overruled.

### 4. JURY'S ANSWERS TO QUESTION NO. 2 FINDING PERCENTAGES OF RESPONSIBILITY ARE SUPPORTED BY SUFFICIENT EVIDENCE

In their third issue, appellants maintain we should reverse and render judgment or remand because the evidence is legally and factually insufficient to support the jury's answers to Question No. 2 (subparts 1 and 2) regarding the percentages of responsibility assessed against Dr. Salguero and Robinson.

Appellants incorporate their previous discussion of the evidence and argument set forth in issues one and two. Appellants maintain "[f]or those same reasons, the evidence is legally and factually insufficient to support the jury's answers to Question No. 2 (subparts 1 and 2) that Dr. Salguero and Robinson caused or contributed to cause in any way A.W.'s death."

As addressed, *supra*, in our analyses of issues one and two, there is legally and factually sufficient evidence to support the jury's answers to Question No. 2.

Moreover, the determination of negligent parties' proportionate responsibility is a matter soundly within the jury's discretion; it is not the place of this court to substitute its judgment for that of the jury. *See Hagins v. E-Z Mart Stores, Inc.*, 128 S.W.3d 383, 392 (Tex. App.—Texarkana 2004, no pet.).

Appellants' third issue is overruled.

### 5. JURY'S ANSWERS TO QUESTION NO. 4 FINDING PECUNIARY LOSS DAMAGES ARE SUPPORTED BY SUFFICIENT EVIDENCE

In their fifth issue, appellants argue that there is not legally and factually sufficient evidence to support the jury's awards for past or future pecuniary loss damages in Question No. 4.

### a. LAW GOVERNING PECUNIARY LOSS

Pecuniary loss is defined as the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that the parents would, in reasonable probability, have received from their child had the child lived. *Moore v. Lillebo*, 722 S.W.2d 683, 687 (Tex. 1986). Thus, "[p]ecuniary loss in a wrongful-death case is not subject to precise mathematical calculation, and the jury is given significant discretion in determining this element of damages." *Christus Health v. Dorriety*, 345 S.W.3d 104, 113 (Tex. App.—Houston [14th Dist.] 2011, pet. denied).

Pecuniary losses may be recovered even in the absence of specific evidence of the amount of contributions being made by the deceased before her death or that she would have continued to contribute in the future. *See John Deere Co. v. May*, 773 S.W.2d 369, 381 (Tex. App. —Waco 1989, writ denied). The Waco Court of Appeals has observed that measuring a beneficiary's pecuniary loss is inherently speculative and imprecise and is therefore best left to the jury's common sense and sound discretion. *Id*. at 379–80. While the amount of damages awarded must be

supported by evidence, jurors may apply their knowledge and experience to estimate the value of services, such as household services, without proof of their value. *See Dorriety*, 345 S.W.3d at 113; *see also Excel Corp. v. McDonald*, 223 S.W.3d 506, 510 (Tex. App.—Amarillo 2006, pet. denied). Noting the difficulties in proving, measuring, and challenging the jury award of pecuniary loss, courts have concluded that '[t]he judgment of the jury is as good as that of the court, and it should prevail unless it appears that the verdict is influenced by passion or prejudice and is not the result of honest convictions.'" *Samco Properties, Inc. v. Cheatham*, 977 S.W.2d 469, 480 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (quoting *Louisiana & A. Ry. Co. v. Chapin*, 225 S.W.2d 614, 616 (Tex. Civ. App.—Texarkana 1949, writ ref'd).

### b. APPLICATION

In this case, the jury awarded Thompson $10,000 and $500,000 in past and future pecuniary losses, respectively, and awarded Washington $25,000 and $500,000 in past and future pecuniary losses, respectively. Appellants contend that the evidence is legally and factually insufficient to support these awards. Appellants argue that "the jury heard only vague and general testimony about the alleged pecuniary contributions A.W. made or would have made to Thompson and Washington." Appellants further maintain that appellees' expert's testimony on such economic losses was generic and the jury had to speculate on any pecuniary losses.

In relation to pecuniary damages, the jury heard testimony that A.W. assisted with the care of her younger half-brother. A.W. "wanted to be a baby doctor. She loved children." Additionally, the jury heard testimony that A.W. planned to take care of her parents as they grew older and help them in any way needed.

An economist, Justin Blok ("Blok") testified on behalf of appellees regarding the pecuniary losses suffered by appellees. Blok was retained to provide a range of appellees' pecuniary losses resulting from A.W.'s death. Blok provided testimony concerning three scenarios: (1) A.W. as a high school graduate only; (2) A.W. as a college graduate; and (3) A.W. as an obstetrician/gynecologist using Bureau of Labor Statistics information to calculate A.W.'s potential lost earnings under the three scenarios. For each scenario he used an estimate of 15 hrs/week at $9/hr for household services and projected a life expectancy of 81 years. He used an expected work life of 33 years. He testified that the discounted, present value of economic loss was $1.7 million (scenario 1), $2 million (scenario 2), and $4.3 million (scenario 3). Blok's calculations were significantly higher than what the ultimately the jury awarded appellees.

The foregoing evidence is legally and factually sufficient to support the jury's answers. As set forth above, the jury heard testimony from both parents as well as an economist. Although appellants point out several alleged shortcomings in Blok's testimony—such as an absence of testimony on A.W.'s likely life trajectory, when Washington might require future pecuniary help, how A.W. might allocate her money in the future, or the specific amounts of A.W.'s economic contributions—the jury weighed all the evidence and arrived at a number within the range Blok offered. In determining pecuniary loss, a jury is entitled to use their own knowledge and experience in reaching their verdict. *See Dorriety*, 345 S.W.3d at 113. Blok's testimony gave the jury additional evidence beyond their own experiences. On this record, therefore, we conclude that sufficient evidence supports the jury's award of pecuniary damages to Thompson and Washington. *See May*, 773 S.W.2d at 379–81.

Appellant's fifth issue is overruled.

26

### c.    REMITTITUR

In the alternative, appellants argue that we should suggest a remittitur because the awards for pecuniary losses are not supported by factually sufficient evidence and are excessive.  Because we have concluded that the jury's findings on pecuniary loss are supported by sufficient evidence, we need not address appellants alternative argument for remittitur.

## B.    ADMISSIBILITY OF EVIDENCE

In their fourth issue,[9] appellants assert that the trial court abused its discretion in admitting Dr. Moss's expert testimony on causation, arguing that Dr. Moss's testimony is unreliable, speculative, and conclusory.  Additionally, Appellants argue that the trial court abused its discretion in admitting testimony and evidence regarding alleged pre-March 1, 2012 negligence.

### 1.    ADMISSIBILITY OF EXPERT TESTIMONY

#### a.    STANDARD OF REVIEW

We review a trial court's rulings admitting expert testimony, including rulings on the reliability of expert testimony, for an abuse of discretion.  *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347–48 (Tex. 2015); *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006); *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006); *In re J.R.*, 501 S.W.3d 738, 748 (Tex. App.—Waco 2016, no pet.).

Under this standard, the trial court has broad discretion in deciding whether to admit or exclude expert's testimony.  *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998).  We reverse only if the trial court acted

---

[9]  As noted, *supra*, appellants make this argument in issue 1(e), as well.  We address appellants' contentions regarding the admissibility of Dr. Moss's testimony here.

arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Mendez*, 204 S.W.3d at 800; *In re J.R.*, 501 S.W.3d at 748.

### b.  APPLICABLE LAW

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Tex. R. Evid. 702.  A two-part test governs whether expert testimony is admissible: (1) the expert must be qualified; and (2) the testimony must be relevant and be based on a reliable foundation. *Mendez*, 204 S.W.3d at 800; *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995).  In evidentiary matters, a trial court is a gatekeeper, ensuring expert testimony is relevant and based on a reliable foundation.  *See In re J.R.*, 501 S.W.3d at 748.

In deciding if an expert is qualified, trial courts must ensure that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion.  *Mendez*, 204 S.W.3d at 800.  The Supreme Court identified in *Robinson* six factors that trial courts may consider in determining whether expert testimony is reliable and thus admissible.  *Mendez*, 204 S.W.3d at 801 (citing *Robinson*, 923 S.W.2d at 557).  However, it emphasized in *Robinson* that "these factors are non-exclusive and that Rule 702 contemplates a flexible inquiry." *Id.*

Indeed, in *Gammill*, the Supreme Court recognized that the *Robinson* factors may not apply to certain testimony.[10]  *See* 972 S.W.2d at 720, 726 (recognizing

---

[10]  Appellees advocate that we evaluate  the reliability of psychiatric expert testimony or "soft" science testimony based upon the Court of Criminal Appeals' *Nenno* factors, rather than

that *Robinson* factors did not apply to the mechanical engineer expert under consideration even though his claimed expertise was scientific in nature). Experience alone may provide a sufficient basis for an expert's testimony in some cases. *Id.* at 726; *Cady v. Cargile*, No. 10-13-00026-CV, 2015 WL 2058965, at *2 (Tex. App. —Waco Apr. 30, 2015, no pet.) (finding *Robinson* factors do not readily lend themselves to a review of psychiatrist's opinion).

The Supreme Court recognized that "the criteria used to evaluate the reliability of expert testimony depends on the nature of the evidence." *Tamez*, 206 S.W.3d at 579 (citing *Gammill*, 972 S.W.2d at 726). "In determining reliability, the trial court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id*. (citation omitted). "A significant part of the trial court's gatekeeper function is to evaluate the expert's qualifications, listen to the testimony, view the evidence, and determine which factors and evaluation methodology are most appropriate to apply." *Id*.

---

the *Robinson* factors." *See Nenno v. State*, 970 S.W.2d 549, 560 (Tex. Crim. App. 1998*), overruled in part on other grounds*, *State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999) (noting that when measuring the reliability of an expert's opinion in fields within the soft sciences, we consider whether: "(1) the field of expertise is a legitimate one; (2) the subject matter of the expert's testimony is within the scope of that field; and (3) the expert's testimony properly relies upon the principles involved in that field of study"); *see also In re J.R.*, 501 S.W.3d at 748 (employing *Nenno* factors in parental termination case to psychologist's testimony); *see also In re A.J.L.*, 136 S.W.3d 293, 297–301 (Tex. App.—Fort Worth 2004, no pet.) (applying soft science factors in parental termination case to counselor's testimony); *In re G.B.*, No. 07–01–0210–CV, 2003 WL 22327191, at *2 (Tex. App.—Amarillo Oct. 10, 2003, no pet.) (mem. op.) (same). In light of the Supreme Court's recognition that the *Robinson* factors may not apply to certain testimony, we decline to adopt a new test to evaluate the reliability of the psychiatric testimony in this case. *See Gammill*, 972 S.W.2d at 720, 726.

## 2. DR. MOSS'S TESTIMONY

Appellants first challenge the reliability of Dr. Moss's testimony as a whole.[11] Appellants argue that the trial court abused its discretion in admitting Dr. Moss's testimony because there is an "absence of evidence tying any of the alleged negligence to A.W.'s suicide and there is no legally or factually sufficient evidence of proximate cause because Appellees' causation evidence [which is based on Dr. Moss's testimony] is speculative, conclusory, and unreliable." Appellants maintain that Dr. Moss could not specifically state what appellants could have done differently to prevent A.W.'s suicide, and his testimony was not grounded in science or fact. Appellants contend that Dr. Moss's opinions are "nothing more than the *ipse dixit* of a retained expert." We disagree.

"[A]n expert's statement or opinion is conclusory when . . . he offers only his word that the bases offered to support his opinion actually exist or support his opinion." *Windrum*, 581 S.W.3d at 769. Bare or baseless opinions cannot support a judgment, even if there was no objection over their admission into evidence. *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009). An "expert must explain the basis of his statements to link his conclusions to the facts." *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999); *see also Jelinek*, 328 S.W.3d at 536. An expert's statement or opinion is conclusory when: (1) he asks the fact finder to take his word that his opinion is correct but offers no basis for his opinion or the bases offered do not actually support the opinion; or (2) he offers only his word that the bases offered to support his opinion actually exist or support his opinion. *See id.* The line determining whether an expert opinion is conclusory is difficult to draw, and "[c]lose calls must go to the trial court." *See Larson v. Downing*, 197

---

[11] Although Rule 702 of the Texas Rules of Evidence requires a finding that the witness is qualified to testify, appellants do not challenge Dr. Moss's qualifications; thus, we do not review that finding in this appeal.

S.W.3d 303, 304 (Tex. 2006) (per curiam). When the evidence falls within the zone of reasonable disagreement, the court may not substitute its judgment for that of the fact finder. *See Wilson*, 168 S.W.3d at 822.

Dr. Moss's opinions were largely, although not exclusively, based upon his clinical experience and training as a psychiatrist. Appellants do not contend that psychiatry is not a legitimate field of expertise, nor do they contend that suicide and its causes are not within the subject matter of the field of psychiatry. Dr. Moss's opinions on causation in this case relied upon the principles applicable to the field of psychiatry. Further, Dr. Moss's opinions on causation are logically connected to the data available to him and he explained his reasoning. Viewing Dr. Moss's opinion in light of the standards that apply, Dr. Moss's opinions are factually grounded and reliable. *See Lance v. Lewisville Indep. Sch. Dist.*, No. 04-11-CV-00032, 2012 WL 1668198, at *3–5 (E.D. Tex. May 11, 2012) ("A witness' experience [relating to suicide], studies and education, combined with a review of the relevant materials can provide a reliable basis for expert testimony."); *Draughon v. United States*, No. 14-2264-JAR-GLR, 2017 WL 3492313, at *2–6 (D. Kan. August 15, 2017) (Federal Tort Claims Act case for medical negligence against the VA for a patient's suicide found psychiatrists and psychologist expert opinions admissible).

Appellants attack Dr. Moss's testimony as unreliable because he could not exclude that A.W. might have committed suicide even if A.W. had been appropriately treated. Yet, as set forth above, that is not the proper standard for evaluating causation testimony of an expert. Appellants simply disagree with Dr. Moss's testimony and offered the jury an alternative that the jury rejected. Dr. Moss's opinions are based on his experience in a legitimate field of expertise and his testimony relies on principles that are involved in that field. *See Wilkins*, 47

S.W.3d at 499 (instructing the trial court to gauge the expert's reliability by ensuring "that the opinion comports with applicable professional standards outside the courtroom").

Additionally, in a pretrial hearing the trial court considered appellants' contention that Dr. Moss's opinions on causation are unreliable. The trial court denied appellants' challenges, subject to reurging. The trial court could reasonably have concluded that Dr. Moss's opinions have a reliable basis in the knowledge and experience of the psychiatry profession. Appellants' complaints to Dr. Moss's opinions are weight over admissibility challenges. It is evident from the record that the trial court acted with reference to the appropriate guiding rules and principles of Texas Rule of Evidence 702 and interpretive case law in determining the qualification of appellees' expert, Dr. Moss. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Accordingly, the trial court did not abuse its discretion by admitting Dr. Moss's expert testimony. Appellants' fourth issue is overruled.

### 3. PRE-MARCH 1, 2012 NEGLIGENCE

Appellants contend that the trial court abused its discretion in admitting evidence of alleged pre-March 1, 2012 negligence, likely leading to the rendition of an improper judgment. Appellants maintain that appellees' experts were unable to say that the diagnosis or alleged mismanagement of abdominal migraines or other "red flags" were a proximate cause of A.W.'s suicide. According to appellants, this evidence was wholly irrelevant to the key issue of liability. Appellants further argue that, even if it were relevant, its probative value was far

outweighed by its prejudicial value; thus, appellants contend its admission was harmful.

Dr. Lessin testified regarding substandard care by appellants during office visits prior to March 1, 2012, including A.W.'s abdominal migraines and intractable vomiting. Dr. Moss, in turn, opined that the "red flags" in the past identified by Dr. Lessin could create an associated depressed mood. As it relates to the "red flags" pre-March 1, 2012, Dr. Moss explained:

> . . . Before March 1st they had not expressed themselves in such a way than anyone had been alerted to the notion that they were possible depressive equivalent symptomology. As of March 1st an . . . astute clinician looking back at the records as, in fact, the doctor— doctor also noted, would see that oh, oh, oh, sort of looking backwards and seeing that those, indeed, become red flags retroactively to today —today, March 1st, chief complaint of my daughter has depressed mood.

Essentially, a review of A.W.'s past records on March 1, 2012, might have revealed red flags in relation to her March 1, 2012, presentation of depression. The trial court reasonably could have found that the testimony from Drs. Lessin and Moss regarding "red flags" pre-March 1, 2012, was relevant as to how A.W. was treated on March 1, at which time A.W. was prescribed Celexa.

In reaching its determination to allow Dr. Moss's testimony regarding pre-March 1, 2012 negligence, the trial admonished counsel as follows:

> THE COURT: Let me say this, Counsel, for appellate purposes, there has to be rock solid causation proven with facts and reliable expert testimony. Otherwise, if there is a jury verdict in favor of plaintiffs, it will be reversed on appeal. So we are looking at a very exacting standard on appeal. The issue may be how we get there.

> I am going to use the term "art" not in the sense of soft science, but I'm going to use the term "art" in the sense of the calculus upon which these opinions are derived. And as Trial Court Judge, at this juncture, I am thinking that, perhaps for good reason the defense is viewing this

> like an engineer building a bridge with a very specific formula that the bridge needs to be built. One, two, three, four. And, if it's done out of order, the bridge will collapse.
>
> The flip side being that this is more art and science medicine that the calculus is a little bit more fooling. So I'm going to allow plaintiffs, since this is part art, part science, I'm going to allow them to go into these factors which may be a little more fluid . . . .

The trial court reiterated to appellants' counsel that "if there's something outside the realm of reasonableness that . . . call for an objection, we'll excuse the jury, make me aware of it, I'll hear it and I may rule in your favor."

Appellants argue that even if this evidence was relevant, its probative value was far outweighed by its prejudicial effect and, as such, should have been excluded. Appellants contend that the trial court erred in allowing appellees to emphasize all of this negligence during trial despite the fact that Dr. Salguero never saw A.W. on the March 1 and April 17 visits or participated in the July 31 phone call. This contention lacks merit. As previously addressed, Dr. Salguero is not absolved from liability by the mere fact he did not treat A.W. personally. He failed to train and/or monitor PCC clinicians. He conceded he was supervisor and was responsible for the employees of PCC.

The trial court did not abuse its discretion by admitting testimony concerning pre-March 2012 negligence.

Appellants' fourth issue is overruled.

## C. COMPUTATION OF PREJUDGMENT INTEREST

In their sixth issue, appellants maintain that the trial court improperly computed prejudgment interest. Appellants contend that prejudgment interest should be apportioned between past and future noneconomic damages when computing prejudgment interest.

### 1.   STANDARD OF REVIEW

We review issues of statutory construction *de novo*. *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011) (citing *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex. 2003)).  "Our primary objective in construing statutes is to give effect to the Legislature's intent."  *Molinet*, 356 S.W.3d at 411 (citing *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009)).  It is a rule of statutory construction that every word of a statute must be presumed to have been used for a purpose, and each sentence, clause, and word is to be given effect if reasonable and possible.  *See Tex. Workers' Comp. Ins. Fund v. Del Indus., Inc.*, 35 S.W.3d 591, 593 (Tex. 2000) (citing *Perkins v. State*, 367 S.W.2d 140, 146 (Tex. 1963)); *see also Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981).  Likewise, every word excluded from a statute must also be presumed to have been excluded for a purpose.  *See Cameron*, 618 S.W.2d at 540.  In addition, we do not view disputed portions of a statute in isolation.  *Del Indus., Inc.*, 35 S.W.3d at 593 (citing *Bridgestone/Firestone, Inc. v. Glyn–Jones*, 878 S.W.2d 132, 133 (Tex. 1994)).  "The plain meaning of the text is the best expression of legislative intent unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results."  *Molinet*, 356 S.W.3d at 411 (citing *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008)).

### 2.   APPLICABLE LAW

Section 74.301, "Limitation on Noneconomic Damages," states:

> In an action on a health care liability claim where final judgment is rendered against a physician or health care provider other than a health care institution, the limit of civil liability for noneconomic damages of the physician or health care provider other than a health care institution, inclusive of all persons and entities for which

> vicarious liability theories may apply, shall be limited to an amount not to exceed $250,000 for each claimant, regardless of the number of defendant physicians or health care providers other than a health care institution against whom the claim is asserted or the number of separate causes of action on which the claim is based.

Tex. Civ. Prac. & Rem. Code § 74.301(a). "Noneconomic damages" is defined in Chapter 74 as having "the meaning assigned by Section 41.001." *Id.* § 74.001(a)(20). Section 41.001 defines "Noneconomic damages" as

> damages awarded for the purpose of compensating a claimant for physical pain and suffering, mental or emotional pain or anguish, loss of consortium, disfigurement, physical impairment, loss of companionship and society, inconvenience, loss of enjoyment of life, injury to reputation, and all other nonpecuniary losses of any kind other than exemplary damages.

Tex. Civ. Prac. & Rem. Code § 41.001(12). Section 41.001(4) defines economic damages as "compensatory damages intended to compensate a claimant for actual economic or pecuniary loss; the term does not include exemplary damages or noneconomic damages." *Id*. § 41.001(4).

Looking first to the language of section 74.301 and utilizing the definitions prescribed by the legislature in section 74.001, prejudgment interest does not fall within the statutory definition of noneconomic damages—which are the only damages limited by section 74.301. *See* Tex. Gov't Code § 311.011(b) (requiring that "words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly"). "'Prejudgment interest is pecuniary in nature, because it does not fall within the definition of noneconomic damages provided by the legislature in chapter 74, and because section 74.301's plain language limits only civil liability for noneconomic damages, . . . prejudgment interest is not included in section 74.301's limit on civil liability for noneconomic damages.'" *Christus Health Gulf Coast v. Houston*, No.

01-14-00399-CV, 2015 WL 9304373, at *9 (Tex. App.—Houston [1st Dist.] Dec. 22, 2015, no pet.) (quoting *Chesser v. LifeCare Mgmt. Serfs., L.L.C.*, 356 S.W.3d 613, 641 (Tex. App.–Fort Worth 2011, pet. denied)).

### 3. APPLICATION

The trial court determined that the total award of past non-economic damages is less than the cap that applies, so all capped non-economic damages should be considered past damages. The jury awarded noneconomic damages totaling $6,600,000.00 ($2,200,000.00 to Thompson and $4,400,000.00 to Washington). Initially, the trial court applied section 74.301 and capped Thompson and Washington's noneconomic damages at $250,000.00. The court then apportioned the capped noneconomic damages between Thompson ($83,333.33) and Washington ($166,666.67) based on the percentage of noneconomic damages awarded to each as compared to the total noneconomic damages awarded. The court computed prejudgment interest on the entire amount of the noneconomic damages cap of $250,000.00.

Appellants argue the trial court erred in applying the entire cap to past noneconomic damages when computing prejudgment interest. Appellants maintain that the plain language of section 74.301 makes no distinction between past and future noneconomic damages when applying the cap. Appellants contend that the cap applies to limit all noneconomic damages awarded in a judgment on a health care liability claim. *See* Tex. Civ. Prac. & Rem. Code § 74.301(a). According to appellants, the only way to ensure that prejudgment interest is correctly assessed only on past noneconomic damages is to assess it on the percentage of the $250,000 cap equal to the percentage that past noneconomic damages awarded comprises the total noneconomic damages awarded. Thus, according to appellants,

37

the final judgment should have computed prejudgment interest of $4,007.83 for Thompson and $9,146.50 for Washington. We disagree.

Because section 74.301's plain language limits only civil liability for noneconomic damages, prejudgment interest is not included in section 74.301's limit on civil liability for noneconomic damages. *See Houston*, 2015 WL 9304373, at *9. As such, appellants have not demonstrated the trial court erred in its calculation of prejudgment interest. Appellants' sixth issue is overruled.

### III.    Conclusion

Because we have overruled all issues on appeal, we affirm the judgment of the trial court.

/s/      Margaret "Meg" Poissant
         Justice

Panel consists of Justices Wise, Jewell, and Poissant.