

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-20-00380-CV

———————————————

THE CITY OF HENRIETTA, TEXAS, Appellant

V.

LENA FAYE SMITHSON, Appellee

On Appeal from the 97th District Court
Clay County, Texas
Trial Court No. 2019-0179C-CV

Before Bassel, Womack, and Walker, JJ.
Memorandum Opinion by Justice Walker

# MEMORANDUM OPINION

After sewage entered Appellee Lena Faye Smithson's home, she sued Appellant the City of Henrietta, Texas for the property damage caused by the sewage. Evidence in the record indicated that the sewer main running outside Smithson's house experienced a blockage several days before, and again several days after, the sewage entered her home. On both occasions, the City used a piece of motor-driven equipment called a jetter to clear the blockages. During this time, the City discovered that it needed to replace the clay pipes making up the main sewer line located under the street outside Smithson's home; the City replaced the pipes within days of the second blockage.

To Smithson's suit, the City filed a plea to the jurisdiction asserting immunity from Smithson's claims and arguing that the immunity waiver relied on by Smithson— for property damage caused by the use of motor-driven equipment—did not apply. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.021(1). The trial court denied the plea after a hearing, and the City now appeals. In one issue, the City argues that there was no nexus between the jetter's use and the sewer backup that damaged Smithson's home and that the trial court therefore does not have jurisdiction. Because the evidence does not negate the existence of jurisdictional facts, we affirm.[1]

---

[1] A proper jurisdictional analysis does not involve a significant inquiry into the substance of the plaintiff's claims. *Ryder Integrated Logistics, Inc. v. Fayette Cnty.*, 453 S.W.3d 922, 928 (Tex. 2015). As such, we do not express any opinion on the City's actual culpability.

# I. BACKGROUND

In her petition, Smithson explained the events that led to her suing the City. She left her home on E. Crafton Street on the morning of October 6, 2018, and returned the next morning to discover that the flooring in most of her home was covered in sewage.

On October 19, 2018, Smithson filed a claim with the City. The next month, she received a letter from the City's insurer, the Texas Municipal League Intergovernmental Risk Pool, denying her claim and any negligence by the City.

Smithson also filed a complaint with the Texas Commission on Environmental Quality (TCEQ).[2] According to Smithson, after TCEQ investigated, the City belatedly reported to TCEQ that on October 8, 2018, a broken sewer main on the 1200 block of E. Crafton had discharged wastewater "and that this unauthorized discharge was due to actions taken to address a blockage in the sewer main."[3] The City's report stated that

---

[2]TCEQ investigated after the Smithson complaint, and it apparently issued two citations to the City, one of which, according to Smithson, was for failure to maintain an operating sewer line in the area. Neither party provided the trial court with a copy of the citation.

[3]The parties' evidence did not address this allegation that the City admitted that its attempts to clear the blockage on October 8 caused wastewater discharge. As this alleged discharge happened after the sewer backup into Smithson's home had already occurred, it has relevance to Smithson's claim only to the extent it suggests that a jetter's use can cause a sewer to discharge wastewater somewhere it should not. No record evidence suggested that the City's clearing of the October 8 blockage caused sewage to enter a residence or resident's service line, however.

3

it had used a motor-driven "jetter machine" to clear the blockage. Smithson alleged that the City eventually conceded that the jetter had also been used on October 4, 2018, to clear a blockage in the sewer main near Smithson's home.

Based on these allegations, Smithson sued the City for negligence, seeking damages for the harm to her property caused by the sewage. She contended that the City used the jetter "negligently and with complete disregard as to the poor condition of the sewer main pipe down-stream." She also asserted that in September 2019 (that is, after the City received notice of Smithson's claim), the City had spoliated evidence—specifically, work orders and records relating to jobs done by the public works department in the relevant time frame. Smithson alleged that the City may have used the jetter on October 5, 6, or 7, 2018, but that the City had destroyed the records documenting that use.[4]

The City filed an answer and plea to the jurisdiction, to which it attached the September 8, 2020 affidavit of Troy Potts, the director of public works for the City. The trial court held a hearing on the City's plea. At the hearing, the trial court admitted as evidence the transcript of Potts's deposition. In the deposition, Potts was questioned about whether the jetter could have caused the sewer backup, whether the jetter could

---

[4]We do not address Smithson's arguments related to the City's destruction of evidence.

have broken the clay pipes used for the sewer main, and whether using the jetter in broken pipes could have caused the backup into Smithson's home.

After the hearing, the trial court signed an order denying the City's plea, and the City now appeals.

## II. STANDARD OF REVIEW

"Governmental immunity generally protects municipalities and other state subdivisions from suit unless the immunity has been waived by the constitution or state law," and a governmental unit's immunity deprives a trial court of subject matter jurisdiction. *Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 512 (Tex. 2019) (quoting *City of Watauga v. Gordon*, 434 S.W.3d 586, 589 (Tex. 2014)). Whether a trial court has subject matter jurisdiction is a question of law that we review de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

An immunity claim is properly raised by a plea to the jurisdiction. *McKenzie*, 578 S.W.3d at 512. When, as here, the plea relies on evidence to challenge whether facts exist to support jurisdiction, the standard of review mirrors that of a traditional summary judgment. *Miranda*, 133 S.W.3d at 227–28. "If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder," but "if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law." *Id.* In determining whether a material fact issue exists, "[w]e take as true all evidence favorable to the

5

nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *City of Haltom City v. Forrest*, No. 02-20-00084-CV, 2021 WL 733057, at *2 (Tex. App.—Fort Worth Feb. 25, 2021, no pet.) (mem. op.). "We disregard evidence and inferences unfavorable to the plaintiff unless reasonable jurors could not." *Id.* at *3.

## III. DISCUSSION

The City's sole argument is that the trial court lacks subject-matter jurisdiction over Smithson's claims "because [the City]'s governmental immunity was not waived based on Section 101.021 Texas Civil Practice and Remedies Code and [because of] the undisputed fact that there was no causal nexus between the sewer backup suffered by [Smithson] and the operation or use of motorized equipment." Smithson asserts in response that a factual dispute exists to defeat the City's plea.

### A. TTCA WAIVER FOR MOTOR-DRIVEN EQUIPMENT USE

The legislature has waived governmental immunity for property-damage claims caused by a governmental employee's negligence if the property damage "arises from the operation or use of a motor-driven vehicle or motor-driven equipment." Tex. Civ. Prac. & Rem. Code Ann. § 101.021(1)(A). Section 101.021 "does not explicitly require that the operation or use be 'active' or that it be ongoing 'at the time of the incident.'" *PHI, Inc. v. Tex. Juv. Just. Dep't*, 593 S.W.3d 296, 305 (Tex. 2019). But the damage must "arise from" the equipment's use, meaning that the statute "requires a nexus between the injury negligently caused by a governmental employee and the operation or use of

6

a motor-driven vehicle" or equipment. *Id.* at 302 (quoting *LeLeaux v. Hamshire–Fannett ISD*, 835 S.W.2d 49, 51 (Tex. 1992)). In other words, the damage claim must be based on "more than mere involvement of property"; rather, "the use or operation 'must have actually caused the injury.'" *Id.* (quoting *Tex. Nat. Res. Conservation Comm'n v. White*, 46 S.W.3d 864, 869 (Tex. 2001)).

## B. THE EVIDENCE DOES NOT ESTABLISH A LACK OF NEXUS

Resolution of the City's issue turns on whether the evidence established that the jetter use on October 4 did not actually cause the sewer backup into Smithson's home on October 6. Smithson argues that the evidence at least presents a fact question on the issue.

To meet their respective burdens in the trial court, the City relied on Potts's affidavit, and Smithson relied on Potts's deposition testimony. In the affidavit, Potts stated that the sewer main was flowing after the jetter cleared the blockage on October 4. The affidavit further stated that the jetter did not cause the sewer backup into Smithson's home and that if the jetter had caused the issue, the backup would have occurred while the jetter was "pressurizing the line." The affidavit did not, however, explain why a backup into Smithson's service line would have had to have occurred

during the jetter's use if the jetter was the cause of the backup and, as we note below, did not address the issue of whether the broken sewer main played a role in the backup.[5]

The affidavit further stated that in 2018, Potts had looked at the work orders after he received notice of Smithson's claim and that there had been no work orders for the jetter's use on October 5, 6, or 7, 2018.[6] The affidavit acknowledged that the work orders for the jetter machine's use from October 2018 had been destroyed in 2019 at the end of the City's fiscal year.

Attached to the affidavit was a document that Potts described as his "memorandum concerning such works orders and actions concerning events relevant to [Smithson's] claim," based on his 2018 review of the since-destroyed work orders. That memorandum consists of handwritten notes on a piece of paper. The notes are as follows:

> 10-4-18
>
> SEWER STOP
>
> CLEARED BLOCKAGE 6:00 PM
>
> 10-8-18

---

[5]The affidavit did state (with no factual support) Potts's opinion that "the use of the sewer jetter machine on October 4 could not have damaged the sewer main." This statement addressed questioning at Potts's deposition about whether using the jetter in the main's old clay pipes posed a risk of worsening the cracks in the pipes.

[6]Potts also stated in his deposition that he made these notes after receiving notice of Smithson's claim.

SEWER STOP

CLEARED BLOCKAGE 9:00 PM

10-10-18

REPLACED 70' SEWER MAIN W/ NEW PVC

1200 E CRAFTON

The City argues that this document and Potts's affidavit are sufficient to negate the jetter's use as the actual cause of the sewer backup into Smithson's home.

Smithson, in turn, directs us to Potts's deposition testimony acknowledging that the sewer main by Smithson's house suffered another blockage on October 8 and that on October 10, the City replaced portions of the sewer main that were outside Smithson's house. On appeal, Smithson's focus is a theory she raised in the trial court: that the City's use of the jetter in the broken sewer main outside her home caused the sewer backup into her home. Smithson argues that the evidence does not refute this theory, and, reviewing the evidence in the light most favorable to Smithson, we agree.

In his deposition, Potts provided some background information for why the City used the jetter on October 4 and 8. On October 4, Potts spotted water on Crafton Street. Potts explained that normally when there is a sewer discharge, it comes out of a manhole, but when the sewer main's pipes are cracked, "water can seep through those cracks and come up into the street area." The water on the street thus gave Potts two pieces of information: the sewer main was experiencing a blockage, and the clay pipes making up the sewer main likely needed to be replaced. A public works employee used

9

a jetter to clear the blockage. On October 5, Potts discussed with his employees the potential replacement of the sewer main's pipes. Potts's belief about cracked pipes was confirmed on October 8, when the sewer main experienced another blockage, and water once again seeped up onto the street. A public works employee used the jetter to clear the blockage, and, on October 10, the department replaced seventy feet of the Crafton Street sewer main.

Potts stated that the manhole accessed by a City employee to clear the October 4 blockage was upstream of the blockage and that the employee then used the jetter to shoot water downstream.[7] Smithson's service line was upstream of the blockage, and Potts agreed in questioning that when shooting water downstream, "a lot" of the water in the sewer main goes back upstream until the jetter clears the blockage. Potts acknowledged in his deposition that the backup into Smithson's home could have come from the sewer main, as opposed to Smithson's service line. That acknowledgement, however, is not evidence that, if the sewage did come from the sewer main, it did so because of the City's jetter use.

But Smithson argues that because the sewer main had broken pipes, a reasonable inference can be made that the extra water pumped into the sewer by the jetter eventually found its way into Smithson's service line and into her home, and she asserts

---

[7]While this reflects our understanding of Potts's testimony, this part of Potts's testimony included him indicating manhole locations on a map, and neither side's attorney clarified for the record where on the map he had pointed.

10

that Potts's testimony did not rule out this possibility. Potts had this exchange with

Smithson's attorney.

> Q. Right. And on the 4th, sending that much water into the system, we now know, into damaged old clay pipes, some of that sewage went into [Smithson]'s home, didn't it?
>
> . . . .
>
> A. I have no way of knowing that. I have no way of knowing that what we did caused the sewer to flow into [Smithson]'s house.
>
> Q. . . . And in looking at the pictures and looking at the quantity of sewage that went into her home just two days later, in your opinion how did this (Indicating) happen?
>
> A. I don't have an opinion.
>
> Q. You don't have an opinion?
>
> A. No.
>
> Q. What do you mean? You don't want to share an opinion?
>
> A. I don't know how what we did could have caused that. . . . Her service line is on a forty-five degree angle, so the water that we were shooting would have gone past it instead of going up it. So I don't—I don't have an opinion.
>
> . . . .
>
> Q. But Mr. Potts, that's fifty-six feet of damaged pipe that needed to be replaced right in front of her house, isn't it?
>
> A. Yes.
>
> . . . .
>
> Q. And so but when we're sending a jetter down from east to west—

A. Uh-huh.

Q. —with all of that pressure, and we know where this damaged pipe is now, that gravity flow sewage main may not act the way it's supposed to; right?

A. That's correct. It may not.

Q. So perhaps a forty-five degree turn isn't all that unreasonable if the pipe is obliterated right here; correct?

A. Correct.

Potts made other statements that may have been an attempt to address this theory. Using a map, he indicated to Smithson's attorney where Smithson's service line tap was located and, from his testimony, appeared to be indicating that Smithson's service line tap was not in the area where the sewer main's pipes were replaced.[8] But Potts was not asked to explain the relevance of this observation. Potts may have been attempting to convey that using the jetter in the sewer main's broken pipes could not have resulted in the sewer backup into Smithson's home because of the location of her service line. But his meaning is not entirely clear, and neither the testimony elicited from him at the deposition nor the affidavit he subsequently executed established that

---

[8]As with Potts's testimony about manholes, his statements on this point were made while indicating various places on a map, and several aerial view street maps are in the record. But the maps in the record do not indicate the locations to which he was pointing during this testimony and do not indicate the location of Smithson's service line or the service line of a neighbor also mentioned by Potts. Thus, we cannot tell from the record exactly what parts of the street were indicated by Potts as the location of Smithson's service line or her neighbor's or what their locations are in reference to the pipes that were replaced.

the jetter's use in the sewer main's broken pipes could not have caused the sewer backup into Smithson's service line. And the City did not supplement its plea with another affidavit from Potts or from an outside expert that negated Smithson's theory.

Taking as true the jurisdictional evidence that was favorable to Smithson and indulging every reasonable inference and resolving any doubts in her favor, we conclude that, at this point in the proceedings, a fact issue remains on whether the jetter's use "actually caused" Smithson's pipe backup and thus whether her damages "arose from" the jetter's use. *Forrest*, 2021 WL 733057, at *2; *City of Blue Ridge v. Rappold*, No. 05-19-00961-CV, 2020 WL 7065830, at *6 (Tex. App.—Dallas Dec. 3, 2020, pet. denied) (mem. op.) (affirming trial court's denial of city's jurisdictional plea and holding that the city's evidence did not conclusively establish that its employees did not negligently use motor-driven equipment in an unsafe manner and that the city's evidence at most created a fact issue on whether the plaintiff's damages were caused by the negligent use); *see PHI*, 593 S.W.3d at 302 (requiring a nexus between the use of motor-driven equipment and the plaintiff's damages).

Because the evidence before the trial court did not conclusively negate the trial court's jurisdiction, we overrule the City's sole issue.

## IV. CONCLUSION

Having overruled the City's sole issue, we affirm the trial court's denial of the City's plea to the jurisdiction.

13

/s/ Brian Walker

Brian Walker
Justice

Delivered: September 30, 2021